IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CYNTHIA SMITH, MICHAEL ELLIS, DOLORES FERRERO, GERRY GRECO, KIMBERLY MARTEL, TIMOTHY MARTINS, JOSEPH MOLINA, PATRICK REYNOLDS, LEONID ROSENBOIM, MATTHEW SAMPSON, HENRY SANCHEZ, and BENJAMIN WAND, individually and on behalf of all others similarly situated, | § § § § § § § § § § § | |
| *Plaintiffs,* | § § | Case No. 1:25-CV-001964 |
| v. | § § | |
| ORACLE, CORP., RHEEM MANUFACTURING CO., TRIMBLE, INC., INTEGRA LIFESCIENCES HOLDING CORP., MILGARD MANUFACTURING, INC., ENVOY AIR, INC., EMERSON ELECTRIC CO., MICHELIN NORTH AMERICA, INC., MKS INSTRUMENTS, INC., SCHNEIDER ELECTRIC USA, INC., and LOGITECH, INC., | § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| *Defendants.* | § § | |

## CLASS ACTION COMPLAINT

Plaintiffs Cynthia Smith, Michael Ellis, Dolores Ferrero, Gerry Greco, Kimberly Martel,

Timothy Martins, Joseph Molina, Patrick Reynolds, Leonid Rosenboim, Matthew Sampson,

Henry Sanchez, and Benjamin Wand ("Plaintiffs") bring this Class Action Complaint, individually

and on behalf of all others similarly situated ("Class Members") against Defendants Oracle, Corp.,

("Oracle"), Rheem Manufacturing Co. ("Rheem"), Trimble, Inc. ("Trimble"), Integra

LifeSciences Holding Corp. ("Integra"), Milgard Manufacturing, Inc. ("Milgard"), Envoy Air, Inc.

("Envoy Air"), Emerson Electric Co. ("Emerson"), Michelin North America, Inc. ("Michelin"),

MKS Instruments, Inc. ("MKS"), Schneider Electric USA, Inc. ("Schneider"), and Logitech, Inc.

("Logitech") (collectively "Defendants"), and allege as follows, based upon information and

belief, the investigation of counsel, and the personal knowledge of Plaintiffs.

## NATURE OF THE CASE

1.    This "hub-and-spoke" data breach involves the unauthorized access and exfiltration

of sensitive personally identifiable information ("PII"), including names, dates of birth, addresses,

bank account numbers, Social Security numbers, tax ID numbers, and passport numbers, of

millions of Class Members, including Plaintiffs.

2.    The "hub" in this breach is Oracle, a company specializing in cloud-based

computing services and data storage serving thousands of corporate clients by helping them "run

their key business operations."[1] During the ordinary course of its business, Oracle stores an

enormous amount of its customers' PII and generated over $57 billion in revenue this fiscal year.

Each of the cyber incursions described below occurred because Oracle's E-Business Suite ("Oracle

EBS") applications, used by spoke Defendants, "***can be exploited remotely without***

***authentication and without requiring user interaction***."[2]

3.    Together, Defendants Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson,

Michelin, MKS, Schneider, and Logitech are referred to herein as the "Spoke Defendants." Oracle

explains to Spoke Defendants that "***[s]ecurity in the cloud is a shared responsibility between you***

***and Oracle***."[3]

---

[1] *See* https://www.oracle.com/applications/ebusiness/ (last visited Nov. 18, 2025).
[2] *See* https://www.securityweek.com/oracle-patches-ebs-vulnerability-allowing-access-to-sensitive-data/ (last visited Nov. 18, 2025) (emphasis added).
[3] *See* https://docs.oracle.com/en-us/iaas/Content/cloud-adoption-framework/security.htm (last visited Nov. 18, 2025) (emphasis added).

4.      Defendant Rheem is one of the world's largest manufacturers of heating, cooling, and water heating solutions for commercial and residential use. Rheem generated over $6 billion in annual revenue this fiscal year.

5.      Defendant Trimble is a technology company that provides hardware, software, and services for positioning, modeling, and data analytics. It generated over $3 billion in revenue last fiscal year.

6.      Defendant Integra is a leading global medical technology company. It generated over $1.5 billion in revenue last fiscal year.

7.      Defendant Milgard is a windows and doors manufacturing company. It generated nearly $1 billion in revenue this fiscal year.

8.      Defendant Envoy Air is the largest regional carrier for American Airlines. It generated over $3 billion in revenue last fiscal year.

9.      Defendant Emerson is a technology and engineering company that provides automation solutions and software, climate technologies, and measurement instruments for various industries. It generated over $18 billion in revenue this fiscal year.

10.      Defendant Michelin is a tire design, manufacture, and sales company. It generated over $10 billion in revenue this fiscal year.

11.      Defendant MKS Instruments is a company that specializes in semiconductor manufacturing and provides solutions, instruments, and systems for high-tech industries. It generated over $3.5 billion in revenue last fiscal year.

12.      Defendant Schneider Electric is a global energy technology company. It generated over $41 billion in revenue last fiscal year.

13.     Defendant Logitech is a company that specializes in designing software-enabled hardware solutions, including manufacturing personal computer accessories. It generated over $4.5 billion in revenue this fiscal year.

14.     The Spoke Defendants are Oracle customers, and each used Oracle's services and software, and in doing so, entrusted Oracle with the PII of their customers and employees.

15.     The data breach at issue was highly preventable and perpetrated using techniques and vulnerabilities known to Defendants well in advance. For example, in an October 8, 2015, blog post about best practices for data security, Defendant Schneider explained to customers that companies like Oracle "*routinely come out with patches to fix the bugs that are bound to crop up in any piece of software. While some bugs simply cause problems with the application, others open the door for intruders to break in*."[4] Shortly thereafter, in a December 2, 2015, blog post entitled "Top 5 Recommendations for Securing the Data Center Against Cyber Attacks," Schneider warned customers that "*recent cyber security breaches have taught us that even the most humble industrial (and office) equipment can be subverted for malicious purposes*."[5] Later, in a June 30, 2021, article, "What is Data Security", Oracle acknowledged that "*[d]ata is one of the most important assets for any organization. As such, it is paramount to safeguard data from any and all unauthorized access*. Data breaches, failed audits, and failure to comply with regulatory requirements can all result in reputational damage, loss of brand equity, compromised intellectual property, and fines for noncompliance. [ . . . ] Sensitive data includes personally identifiable information, financial information, health information, and intellectual property. *Data*

---

[4] *See* https://blog.se.com/homes/2015/10/08/4-best-practices-for-utilities-to-keep-customer-data-secure/ (last visited Nov. 21, 2025) (emphasis added).
[5] *See* https://blog.se.com/datacenter/2015/12/02/top-5-recommendations-securing-data-center-cyber-attacks/ (last visited Nov. 21, 2025).

*must be protected to help avoid a data breach* and to help achieve compliance."[6] Oracle also recognized that "***[d]atabases are valuable repositories of sensitive information, which makes them the primary target of data thieves***."[7] Oracle outlined "a variety of approaches" cybercriminals use to steal customers' data, including as relevant here, "[e]xploiting unpatched systems" and "[e]xploiting weaknesses in applications."[8] Oracle advised that "[c]ompanies have to inform their regulators and/or the impacted individuals without undue delay after becoming aware that their data has been subject to a data breach."[9]

16.    Further, Defendants Emerson, Schneider, Trimble and MKS experienced at least five prior data breaches between 2023 and 2025 alone, some of which involved breaches of an Oracle environment. Specifically, on or about February 7, 2025, Trimble released a security update to address "a recently discovered deserialization vulnerability enabling an external actor to potentially conduct remote code execution (RCE) against a customer's Microsoft Internet Information Services (IIS) web server."[10] The referenced "recently discovered deserialization" was a Chinese cybercriminal group that "successfully exploited CVE-2025-0944, conducted reconnaissance, and rapidly deployed a variety of web shells and custom-made malware to maintain long-term access" to Trimble's networks and systems.[11] Previously, on January 29, 2024, Schneider confirmed a ransomware attack on its networks and systems and exfiltration of data stored on those networks and systems, which Schneider's investigation determined occurred on

---

[6] *See* https://www.oracle.com/security/database-security/what-is-data-security/ (last visited Nov. 21, 2025).
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *See* https://www.cisa.gov/news-events/alerts/2025/02/07/trimble-releases-security-updates-address-vulnerability-cityworks-software (last visited Nov. 20, 2025).
[11] *See* https://thehackernews.com/2025/05/chinese-hackers-exploit-trimble.html (last visited Nov. 20, 2025).

January 17, 2024.[12] In and around November 2024, cybercriminals hacked Schneider's Jira tracking system and exfiltrated 40GB of compressed data.[13] Prior to that, in 2023, Schneider was among the companies whose data was exfiltrated and exposed in the MOVEit Data Breach.[14] With respect to Emerson, in October 2024, cybercriminals stole nearly 1TB of data from Emerson's networks and systems.[15] Also in 2023, MKS experienced a ransomware attack involving the PII and medical information of consumers and employees that also "removed its ability to process orders or ship products."[16]

17.    Fully aware of the threats and vulnerabilities to Defendants' systems and the prior attacks and imminent threat of further attacks on those systems, in July 2025, Oracle published a "Critical Patch Update Advisory" for its customers.[17] Oracle explained "***[t]hese patches address vulnerabilities in Oracle code** and in third party components included in Oracle products.[18] Oracle claimed to have fixed approximately 200 different vulnerabilities via the July 2025 Critical Patch Update.[19] Nine of the patches were for Oracle's EBS, including three that were for vulnerabilities

---

[12] *See* https://www.se.com/ww/en/about-us/newsroom/news/press-releases/sustainability-business-division-of-schneider-electric-responds-to-cybersecurity-incident-65b8035eb11dced626091019 (last visited Nov. 19, 2025).

[13] *See* https://www.securityweek.com/schneider-electric-launches-probe-after-hackers-claim-theft-of-user-data/ (last visited Nov. 19, 2025).

[14] *See* https://cyberscoop.com/schneider-electric-siemens-energy-moveit-cl0p/ (last visited Nov. 19, 2025).

[15] *See* https://www.securityweek.com/industrial-giants-schneider-electric-and-emerson-named-as-victims-of-oracle-hack/; *and* https://x.com/H4ckManac/status/1841136590900408600 (last visited Nov. 19, 2025).

[16] *See* https://www.bankinfosecurity.com/mks-instruments-ransomware-attack-results-in-200m-sales-hit-a-21442 (last visited Nov. 20, 2025).

[17]  *See* https://www.oracle.com/security-alerts/cpujul2025.html (last visited Nov. 18, 2025).

[18]  *Id.* (emphasis added).

[19] *Id.*

that could be exploited remotely without authentication, and three that could be exploited without user interaction.[20]

18.    In October 2025, Oracle's Chief Security Officer explained that its "ongoing *investigation ha[d] found the potential use of previously identified vulnerabilities that are addressed in the July 2025 Critical Patch Update*."[21] On or about October 2, 2025, Oracle issued an "Oracle Security Alert Advisory – CVE-2025-61882," which explained to its customers that "*[t]his vulnerability is remotely exploitable without authentication, i.e., it may be exploited over a network without the need for a username and password. If successfully exploited, this vulnerability may result in remote code execution*."[22] After Oracle issued a patch for CVE-2025-61882, however, customers and researchers indicated that the installation of the patch did not work to prevent exploitation by cybercriminals.[23]

19.    On September 29, 2025, Google's Threat Intelligence Group ("GTIG") and Mandiant began tracking a "*large-scale extortion campaign by a threat actor* claiming affiliation with the CL0P extortion brand."[24] GTIG explained that the threat actor sent extortion emails to "a high volume" of Spoke Defendant executives concerning the theft of "sensitive data" from Oracle's EBS environments used by the Spoke Defendants.[25] GTIG noted that, according to Oracle, "*the threat actors may have exploited vulnerabilities that were patched in July 2025* and

---

[20] *Id.*

[21] *See* https://www.securityweek.com/oracle-says-known-vulnerabilities-possibly-exploited-in-recent-extortion-attacks/ (last visited Nov. 18, 2025) (emphasis added).

[22] *See* https://www.oracle.com/security-alerts/alert-cve-2025-61882.html (last visited Nov. 18, 2025) (emphasis added).

[23] *See* https://www.bleepingcomputer.com/news/security/oracle-silently-fixes-zero-day-exploit-leaked-by-shinyhunters/ (last visited Nov. 19, 2025).

[24] *See* https://cloud.google.com/blog/topics/threat-intelligence/oracle-ebusiness-suite-zero-day-exploitation (last visited Nov. 18, 2025).

[25] *Id.*

recommended that customers apply the latest critical patch updates."[26] GTIG further noted that "on Oct. 4, 2025, *Oracle directed customers to apply emergency patches to address this vulnerability*[.]"[27] According to GTIG's analysis, the threat actor's extortion campaign was the result of "months of intrusion activity targeting EBS customer environments," prior to any patch being made available by Oracle.[28] GTIG observed that "*the threat actor successfully exfiltrated a significant amount of data from impacted organizations*."[29]

20.    GTIG's analysis concluded that "[t]he threat actor(s) store payloads directly in the EBS database" and further detailed and deconstructed the "the multi-stage Java implant framework used by the threat actors to compromise Oracle EBS[.]"[30] Specifically, GTIG described the threat actors' modus operandi of stealing the data and then initiating extortion attempts several weeks later.[31] GTIG provided details on the extortion emails, including statements from the threat actors that "*[w]e have recently breached your Oracle E-Business Suite application and copied a lot of documents. All the private files and other information are now held on our systems*."[32] The threat actors explained that, if a ransom was not paid, Defendants could expect that they would "lose all abovementioned data: *some of it will be sold to the black actors, the rest will be published on our blog and shared on torrent trackers*."[33] GTIG observed that, "prior to the release of the July 2025 Oracle EBS security updates[,]" there was some evidence of "an early attempt at exploitation of Oracle EBS servers."[34] By "August 2025, a threat actor began exploiting a vulnerability in the

---

[26] *Id.* (emphasis added).
[27] *Id.* (emphasis added).
[28] *Id.*
[29] *Id.* (emphasis added).
[30] *Id.*
[31] *Id.*
[32] *Id.* (emphasis added).
[33] *Id.* (emphasis added).
[34] *Id.*

SyncServlet component, ***allowing for unauthenticated remote code execution***."[35] GTIG attributed the theft and extortion to "FIN11 threat clusters" based on the "the exploitation of managed file transfer (MFT) systems frequently attributed to FIN11."[36] GTIG noted that the threat actors have "employed this approach since at least late 2020."[37]

21.    FIN11 is the notorious cybercriminal organization responsible for massive data breaches in MOVEIt, Fortra, Accellion, and Cleo.[38] It appears FIN11 was responsible for the exfiltration and theft of Plaintiffs' and Class Members' PII, while CL0P's notorious ransomware operation was used to extort Spoke Defendants in the weeks following exfiltration.[39]

22.    On October 6, 2025, watchTowr described the exploited Oracle EBS vulnerability (CVE-2025-618882) as "***not just one vulnerability" but "a poetic flow of numerous small/medium weaknesses***" and opined that "[i]f these vulnerabilities as a group existed at one time, our spidey senses tell us ***there is a high probability of more vulnerabilities to be found***."[40]

23.    In fact, there were more vulnerabilities to be found. Less than a week later, on or about October 11, 2025, Oracle issued another "Oracle Security Alert Advisory," this time for CVE-2025-61884," explaining to its customers that "[t]his vulnerability is remotely exploitable without authentication, i.e., it may be exploited over a network without the need for a username

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *See* https://www.securityweek.com/oracle-patches-ebs-vulnerability-allowing-access-to-sensitive-data/ (last visited Nov. 19, 2025).
[39] *See* https://cloud.google.com/blog/topics/threat-intelligence/oracle-ebusiness-suite-zero-day-exploitation (last visited Nov. 18, 2025); *and* https://www.bleepingcomputer.com/news/security/oracle-silently-fixes-zero-day-exploit-leaked-by-shinyhunters/ (last visited Nov. 19, 2025).
[40] *See* https://labs.watchtowr.com/well-well-well-its-another-day-oracle-e-business-suite-pre-auth-rce-chain-cve-2025-61882well-well-well-its-another-day-oracle-e-business-suite-pre-auth-rce-chain-cve-2025-61882/ (last visited Nov. 18, 2025).

and password. If successfully exploited, this vulnerability may result in remote code execution."[41]

**CVE-2025-618884** "***was actively exploited to breach servers***, with a proof-of-concept exploit publicly leaked by the ShinyHunters extortion group."[42] Oracle's Security Alert Advisory failed to disclose to its customers or the public that the flaw had already actively been exploited in cyberattacks or that a public exploit of the vulnerability had been released by an entirely different and notorious cybercriminal organization, ShinyHunters, than had exploited the vulnerability in CVE-2025-618882.[43] BleepingComputer opined, ***"[a]t this point, it is unclear why Oracle patched the exploits like this and mismatched IOCs*** [Indicators of Compromise]" and Oracle refused to comment.[44]

24.    During the data breach, between in and around July 2025 and October 2025, the threat actors systematically and successfully exfiltrated Plaintiffs' and Class Members' PII from Spoke Defendants with unpatched Oracle EBS environments.

25.    On or about October 17, 2025, Envoy Air confirmed a cyberattack involving Oracle's databases containing Envoy Air's customer and business information.[45] Envoy Air refused to answer any questions concerning when the breach occurred, or how long the threat actors had been in its systems.[46] On or about October 16, 2025, the threat actors posted 26GB of data stolen from Envoy Air's Oracle EBS database on its dark web leak site.[47] To date, Envoy Air

---

[41] *See* https://www.oracle.com/security-alerts/alert-cve-2025-61884.html (last visited Nov. 19, 2025).

[42] *See* https://www.bleepingcomputer.com/news/security/oracle-silently-fixes-zero-day-exploit-leaked-by-shinyhunters/ (last visited Nov. 19, 2025).

[43] *Id.*

[44] *Id.*

[45] *See* https://www.reuters.com/sustainability/boards-policy-regulation/envoy-air-targeted-oracle-linked-hacking-campaign-2025-10-17/ (last visited Nov. 19, 2025).

[46] *Id.*

[47] *See* https://www.securityweek.com/american-airlines-subsidiary-envoy-air-hit-by-oracle-hack/ (last visited Nov. 19, 2025).

has not provided any of the victims any notice, nor provided any notice to any state attorneys general.

26.    On or about October 17, 2025, it was publicly reported that Milgard's Oracle database containing its customer and business information was hacked in a cyberattack.[48] Milgard has not publicly commented concerning when the breach occurred, or how long the threat actors had been in its systems.[49] In October 2025, the threat actors posted data stolen from Milgard's Oracle EBS database on its dark web leak site.[50] To date, Milgard has not provided any of the victims any notice, nor provided any notice to any state attorneys general.

27.    In late October 2025, it was publicly reported that Emerson's and Schneider's Oracle databases containing their customer and business information was hacked in a cyberattack.[51] Emerson and Schneider refused to answer any questions concerning when the breach occurred, or how long the threat actors had been in their systems.[52] In October 2025, the threat actors posted 2.7TB of data stolen from Emerson's Oracle EBS database and 116 GB of data stolen from Schneider's Oracle EBS database on its dark web leak site.[53] Suzu Labs remarked that "Clop was inside for three months exploiting the Oracle EBS zero-day with impunity," and noted that "***traditional monitoring completely missed 2.7TB of exfiltration. The 'trusted vendor' security model just died, and every board running Oracle EBS is realizing their attack surface***

---

[48] *See* https://www.dexpose.io/clop-ransomware-breach-at-milgard-com/; *and* https://x.com/FalconFeedsio/status/1979275975813927137 (last visited Nov. 20, 2025).
[49] *Id.*
[50] *Id.*
[51] *See* https://www.thecybersyrup.com/p/schneider-electric-and-emerson-named-in-oracle-e-business-suite-data-breach (last visited Nov. 19, 2025).
[52] *Id.*
[53] *Id.*

*includes dependencies they never assessed*."[54] To date, Emerson and Schneider have not provided any of the victims any notice, nor provided any notice to any state attorneys general.

28.    Because Emerson and Schneider "sit across operational technology supply chains and critical infrastructure dependencies worldwide[,] . . . "*the risk does not end at exfiltration. Sophisticated actors are increasingly pivoting from pure extortion to supply chain exploitation, credential harvesting, and mapping business-critical workflows* that can later be disrupted or manipulated."[55] Blumira observed that *the threat actors responsible "know where to advertise [the stolen data] and how to sell it. I suspect this will have a long tail for potentially years to come*."[56]

29.    On November 14, 2025, Logitech filed a Form 8-K with the SEC acknowledging a cyberattack involving their Oracle database containing their customer and business information.[57] The Form 8-K explained that Logitech "recently experienced a cybersecurity incident *relating to the exfiltration of data*" and that the cybercriminals used "a third-party software platform [Oracle EBS] and *copied certain data from the internal IT system*."[58] Logitech acknowledged that the exfiltrated data included information about Logitech's employees, as well as consumers.[59] In November 2025, the threat actors posted 1.8TB of data stolen from Logitech's Oracle EBS

---

[54] *See* https://www.scworld.com/news/oracle-ebs-zero-day-attacks-claim-emerson-schneider-electric-as-victims (last visited Nov. 19, 2025) (emphasis added).
[55] *Id.*
[56] *Id.*
[57] *See* https://www.sec.gov/Archives/edgar/data/1032975/000103297525000085/logi-20251114.htm (last visited Nov. 20, 2025).
[58] *Id.* (emphasis added).
[59] *Id.*

database on its dark web leak site.[60] To date, Logitech has not provided any of the victims any notice, nor provided any notice to any state attorneys general.

30.    In November 2025, it was publicly reported that Rheem's Oracle database containing their customer and business information was hacked in a cyberattack.[61] Rheem has not publicly commented concerning when the breach occurred, or how long the threat actors had been in its systems.[62] In November 2025, the threat actors posted data stolen from Rheem's Oracle EBS databases on its dark web leak site.[63] The data stolen from Rheem reportedly consists of "***a full customer and service package that exposes not only contact details but also transaction and product-level metadata,***" including: full names, physical addresses, phone numbers, and email addresses, user IDs, partial credentials, and login tokens related to Rheem portals and warranty systems, invoices, employee communications, contact lists, installation dates, service notes, warranty coverage information, and access credentials for partner networks and authorized service technicians.[64] The theft of installation dates and warranty information is of notable concern because criminals "***could impersonate legitimate technicians or customer service representatives using real information to defraud consumers*** or access additional systems."[65] The seller of Rheem's data explained the theft of Rheem's data occurred in October 2025.[66] To date, Rheem

---

[60] *See* https://www.tomshardware.com/tech-industry/hackers-steal-1-8tb-of-data-from-pc-peripheral-vendor-logitech-firm-says-zero-day-vulnerability-to-blame-no-sensitive-information-stolen (last visited Nov. 20, 2025).

[61] *See* https://zendata.security/2025/11/10/logitech-named-in-cyberattack-a-threat-to-be-taken-seriously/; *and* https://www.technadu.com/cl0p-ransomware-claims-data-breach-of-swiss-tech-giant-logitech/612725/(last visited Nov. 20, 2025).

[62] *Id.*

[63] *Id.*

[64] *See* https://botcrawl.com/rheem-data-breach-exposes-customer-information-and-corporate-files/ (last visited Nov. 20, 2025).

[65] *Id.*

[66] *Id.*

has not provided any of the victims any notice, nor provided any notice to any state attorneys general.

31.    In November 2025, it was publicly reported that Trimble's, MKS's, Integra's and Michelin's Oracle databases containing their customer and business information was hacked in a cyberattack.[67] Trimble, MKS, Integra and Michelin have not publicly commented concerning when the breach occurred, or how long the threat actors had been in their systems.[68] In November 2025, the threat actors posted data stolen from Trimble's, MKS's, Integra's and Michelin's Oracle EBS databases on its dark web leak site.[69] To date, Trimble, MKS, Integra and Michelin have not provided any of the victims any notice, nor provided any notice to any state attorneys general.

32.    Oracle did nothing to fortify its networks to prevent these attacks (collectively the "Data Breach") or otherwise aid Spoke Defendants in preparing and defending against the Data Breach.

33.    GTIG believes that over 100 companies using Oracle EBS have likely been breached by the same threat actors using the same foreseeable and preventable Oracle vulnerability.[70] Accordingly, Plaintiffs reserve the right to amend their complaint to add additional spoke defendants.

---

[67] *See* https://zendata.security/2025/11/10/logitech-named-in-cyberattack-a-threat-to-be-taken-seriously/; https://www.technadu.com/cl0p-ransomware-claims-data-breach-of-swiss-tech-giant-logitech/612725/; https://www.hookphish.com/blog/ransomware-group-clop-hits-integralife-com/ (last visited Nov. 20, 2025); *and* https://www.dexpose.io/clop-ransomware-hits-french-tyre-giant-michelin/ (last visited Nov. 25, 2025).
[68] *Id.*
[69] *Id.*
[70] *See* https://www.reuters.com/sustainability/boards-policy-regulation/google-says-dozens-organizations-affected-by-oracle-linked-hacking-campaign-2025-10-09/ (last visited Nov. 20, 2025).

34.     Plaintiffs and Class Members have been substantially injured by Defendants' data security failures. Plaintiffs' and Class Members' PII has or will be published for sale on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type and they have already published data from the Data Breach on a dark web leak site.

35.     As a result of the Data Breach, Plaintiffs have suffered numerous injuries, including invasion of privacy, lost time and expenses mitigating the risk of data misuse, diminishment in value of their PII, lost time monitoring and repairing credit, and failing to receive the benefit of the bargain reached with Defendants.

36.     Plaintiffs bring this action to hold Defendants accountable for their data security failures, enjoin their continued failure to implement basic and fundamental data security practices, and recover damages and all other relief available at law on behalf of themselves and members of the Class they seek to represent.

## PARTIES

### A.    Defendants

37.     Oracle is a privately held cloud-based relational management company with its headquarters and principal place of business at 2300 Oracle Way, Austin, Texas 78741. Oracle is a for-profit company organized and incorporated under the laws of the State of Delaware. Oracle is a citizen of both Texas and Delaware.

38.     Rheem is a privately held HVAC manufacturing company with its headquarters and principal place of business at 1100 Abernathy Road NE, Suite 1700, Atlanta, Georgia 30328. Rheem is a for-profit company organized and incorporated under the laws of the State of Delaware. Rheem is a citizen of both Georgia and Delaware.

39.     Trimble is a privately held software, hardware, and services technology company with its headquarters and principal place of business at 10368 Westmoor Drive, Westminster, Colorado 80021. Trimble is a for-profit company organized and incorporated under the laws of the State of Delaware. Trimble is a citizen of both Colorado and Delaware.

40.     Integra is a privately held medical technology and manufacturing company with its headquarters and principal place of business at 1100 Campus Road, Princeton, New Jersey 08540. Integra is a for-profit company organized and incorporated under the laws of the State of Delaware. Integra is a citizen of both New Jersey and Delaware.

41.     Milgard is a windows and doors manufacturing company with its headquarters and principal place of business at 1010 54th Avenue East, Tacoma, Washington 98424. Milgard is a subsidiary of Miter Brands, which is a trademark of MI Windows and Doors, LLC located at 50 West Market Street, Gratz, Pennsylvania 17030. Miter Brands is organized and incorporated under the laws of the State of Delaware. Milgard is a citizen of both Washington and Delaware.

42.     Envoy Air is a regional airline company with its headquarters and principal place of business at 4301 Regent Blvd., Irving, Texas 75063. Envoy Air is a wholly owned subsidiary of American Airlines and is incorporated under the laws of the State of Delaware. Envoy Air is a citizen of both Texas and Delaware.

43.     Emerson is a privately held technology and engineering company specializing in industrial automation and climate technologies with its headquarters and principal place of business at 8027 Forsyth Blvd., St. Louis, Missouri 63105. Emerson is a for-profit company organized and incorporated under the laws of the State of Missouri. Emerson is a citizen Missouri.

44.     Michelin is a privately held for-profit tire design, manufacturing and sales company with its United States headquarters and principal place of business at 1 Parkway South, Greenville,

South Carolina 29615. Michelin is a citizen of South Carolina.

45.    MKS is a privately held technology company that supplies instruments, subsystems, systems, process control technologies, and specialty chemical products with its headquarters and principal place of business at 2 Tech Drive, Suite 201, Andover, Massachusetts 01810. MKS is a for-profit company organized and incorporated under the laws of the State of Massachusetts. MKS is a citizen of Massachusetts.

46.    Schneider is a privately held French digital automation and energy management company with its United States headquarters located at 800 Federal Street, Andover, Massachusetts 01810. Schneider is a wholly owned subsidiary of Schneider Electric SE and incorporated under the laws of the State of Delaware. Schneider is a citizen of both Massachusetts and Delaware.

47.    Logitech is a privately held computer accessories manufacturing company with its United States headquarters located at 3930 North 1st Street, San Jose, California 95134. Logitech operates under its holding company, Logitech International SA. Logitech is a citizen of California.

**B.    Plaintiffs**

48.    Plaintiff Cynthia Smith is a resident of Rutherford County, Tennessee and former employee of Oracle.

49.    Plaintiff Michael Ellis is a resident of Saline County, Arkansas and former employee of Rheem.

50.    Plaintiff Dolores Ferrero is a resident of Contra Costa County, California and former employee of Trimble.

51.    Plaintiff Gerry Greco is a resident of Allegheny County, Pennsylvania and former employee of Integra.

52.     Plaintiff Kimberly Martel is a resident of Weld County, Colorado and former employee of Milgard.

53.     Plaintiff Timothy Martins is a resident of Essex County, Massachusetts and former employee of Envoy Air.

54.     Plaintiff Joseph Molina is a resident of Harris County, Texas and former employee of Emerson.

55.     Plaintiff Patrick Reynolds is a resident of Livingston County, Michigan and former employee of Michelin.

56.     Plaintiff Leonid Rosenboim is a resident of Bellevue County, Washington and former employee of MKS.

57.     Plaintiff Matthew Sampson is a resident of Monmouth County, New Jersey and former employee of Integra.

58.     Plaintiff Henry Sanchez is a resident of Bergen County, New Jersey and former employee of Schneider.

59.     Plaintiff Benjamin Wand is a resident of St. Louis County, Missouri and former employee of Logitech.

## JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members, including Plaintiffs Ellis, Greco, Sampson and Sanchez, are citizens of a different state than any Defendant.

61.     This Court has personal jurisdiction over Oracle because Oracle maintains its headquarters and principal places of business in this District. Oracle also conducts substantial business in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

62.     This Court has personal jurisdiction over Rheem because Rheem conducts substantial business in this District, including marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

63.     This Court has personal jurisdiction over Trimble because Trimble conducts substantial business in this District, including the presence of a hardware and software dealer location in this District, marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

64.     This Court has personal jurisdiction over Integra because Integra conducts substantial business in this District, including the operation of Integra's surgical training facility in this District, marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

65.     This Court has personal jurisdiction over Milgard because Milgard conducts substantial business in this District, including marketing to customers and serving customers in

this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

66.    This Court has personal jurisdiction over Envoy Air because Envoy Air conducts substantial business in this District, including operating flights out of the Austin-Bergstrom International Airport, marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

67.    This Court has personal jurisdiction over Emerson because Emerson conducts substantial business in this District, including the operation of Round Rock and Austin offices in this District, marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

68.    This Court has personal jurisdiction over Michelin because Michelin conducts substantial business in this District, including marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

69.    This Court has personal jurisdiction over MKS because MKS conducts substantial business in this District, including the operation of MKS's Controls Business Unit in this District, marketing to customers and serving customers in this District and accepting and processing

payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

70.    This Court has personal jurisdiction over Schneider because Schneider conducts substantial business in this District, including the operation of a manufacturing plant in this District, marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

71.    This Court has personal jurisdiction over Logitech because Logitech conducts substantial business in this District, including marketing to customers and serving customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

72.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(1)–(2), 1391(b)(2), and 1391(c)(2) as hub Defendant Oracle's principal place of business is in this District, and a substantial part of the events giving rise to the claims emanate from activities within this District.

## FACTUAL ALLEGATIONS

### I.    ORACLE'S BUSINESS

73.    Oracle was founded in Santa Clara, California in 1977 with a "mission [] to help people see data in new ways, discover insights, unlock endless possibilities."[71] Oracle serves a myriad of diverse industries from education and government to technology and manufacturing.[72]

---

[71] *See* https://www.oracle.com/corporate/ (last visited Nov. 21, 2025).
[72] https://www.oracle.com/industries/ (last visited Nov. 21, 2025).

74.     Oracle markets its Oracle Cloud Infrastructure ("OCI") as a "next-generation cloud designed to run any application, faster **and more securely**, for less."[73] "OCI offers a common set of 150-plus cloud services in each cloud region" allowing Spoke Defendants "to migrate, modernize, build, and scale [their] IT" on automated data platforms.[74]

75.     Oracle claims that OCI's built in security "**helps organizations reduce the risk of security threats for cloud workloads**" and "helps customers easily adopt and secure their cloud infrastructure, data, and applications."[75]

76.     Oracle offers its customers Data Safe, which Oracle claims "empowers organizations to understand data sensitivity, evaluate data risks, mask sensitive data, implement and monitor security controls, assess user security, monitor user activity, and manage Oracle Oracle AI Database SQL Firewall—all in a single, unified console."[76]

77.     Oracle also offers its customers the Oracle AI Data Platform, which "unifies all types of data—structured, unstructured, batch, and real-time—across your enterprise into an open, and connected platform, laying the foundation for trusted and AI-ready data pipelines."[77]

78.     Oracle's customers, including Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech, store the PII of their customers and/or employees on Oracle's platform through the use of Oracle's EBS and OCI among other offered services and software.

---

[73] *See* https://www.oracle.com/cloud/ (last visited Nov. 21, 2025).
[74] *Id.*
[75] *See* https://www.oracle.com/security/cloud-security/ (emphasis added) (last visited Nov. 25, 2025).
[76] *See* https://www.oracle.com/security/database-security/data-safe/ (last visited Nov. 21, 2025).
[77] *See* https://www.oracle.com/ai-data-platform/ (last visited Nov. 21, 2025).

79.     Oracle has nine different privacy policies and "participates in the EU-U.S. Data Privacy Framework, the Swiss-U.S. Data Privacy Framework, and the UK Extension to the EU-U.S. Data Privacy Framework."[78]

80.     Oracle's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. In recognition of how crucial data security is to the lifeblood of its business, in May 2025, Oracle published a 14-page document for its customers summarizing the "Oracle Corporate Security Practices" ("OCSP").[79] Therein, Oracle explained that: **"*Oracle's Corporate Security Programs are designed to protect both Oracle and customer data*,"** including protecting "sensitive data against theft and malicious alteration, as well as "***[p]ersonal and other sensitive information that Oracle collects in the course of its business, including customer, partner, supplier and employee data***[.]"[80] Oracle claims that its OSCP and policies are "aligned with the ISO/IEC 27002:2022 and ISO/IEC 27001:2022 standards and guide all areas of security within Oracle" and "[r]eflect[] the recommended practices in security standards issued by the International Organization for Standardization (ISO), the United States National Institute of Standards and Technology (NIST), and other industry sources."[81] The OSCP "***authorizes the Oracle Global Information Security organization to provide overall direction for security event and incident preparation, detection, investigation, resolution and forensic evidence handling*** across Oracle's Lines of Business (LoB)."[82] The OSCP also details Oracle's claims to be "[f]ostering security innovations," "***[r]educing the incidence of security weaknesses***

---

[78] *See* https://www.oracle.com/legal/privacy/ (last visited Nov. 21, 2025).
[79] *See* https://www.oracle.com/contracts/docs/corporate-security-practices-4490843.pdf (last visited Nov. 21, 2025).
[80] *Id.* (emphasis added).
[81] *Id.*
[82] *Id.* (emphasis added).

*in all Oracle Products*," and "[r]educing the impact of security weaknesses in released products on customers."[83] Finally, the OSCP discusses Oracle's "Security Alert Program," which includes "issu[ing] out of schedule patches or workaround instructions in case of particularly critical vulnerabilities and/or when active exploits are reported in the wild."[84]

81.    The following additional examples illustrate how Oracle markets and highlights the strength of its data security practices to entice customers to use Oracle's products and services and demonstrates its awareness of industry guidance and regulations that set standards for effective data security practices:

a.    Oracle advertises that "***Oracle believes security should be foundational and built-in, and customers shouldn't be forced to make tradeoffs between security and cost***. Oracle is focused on helping to reduce risk by providing a comprehensive set of simple, prescriptive, and integrated security capabilities that can help organizations secure their OCI tenancy. ***The integrated security services approach reduces the burden on customers***, enabling them to focus on improving their core business."[85]

b.    Oracle claims that "Oracle Cloud Compliance pursues many programs that audit Oracle Cloud ***and help customers address compliance with global, regional, and industry-specific certifications***."[86]

c.    Oracle further claims that "Privacy@Oracle helps customers comply with data privacy principles with Oracle Cloud Infrastructure privacy features."[87]

d.    Oracle's General Privacy Policy represents that "Oracle has implemented appropriate technical, physical and organizational measures designed to protect personal information against accidental or unlawful destruction or accidental loss, damage,

---

[83] *Id.* (emphasis added).

[84] *Id.*

[85] *See* https://www.oracle.com/security/cloud-security/ (last visited Nov. 21, 2025) (emphasis added).

[86] *Id.* (emphasis added).

[87] *Id.*

alteration, unauthorized disclosure or access, as well as all other forms of unlawful processing."[88]

e.    Oracle's Services Privacy Policy represents that "***Oracle has implemented and will maintain technical and organizational measures designed to prevent accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Services Personal Information. These measures, which are generally aligned with the ISO/IEC 27001:2013 standard***, govern all areas of security applicable to the Services, including physical access, system access, data access, transmission, input, security oversight, and enforcement."[89]

82.    During the ordinary course of its business (primarily through the operation of its cloud-based databases), Oracle receives the PII of individuals, including Plaintiffs and Class Members, from its customers Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech.

83.    Because cloud-based databases and software applications like those developed and used by Oracle and the Spoke Defendants are prime targets for cybercriminals due to the volume of data they house and transfer, Defendants knew or should have known of the risks of a potential data breach. In an October 8, 2015, blog post about best practices for data security, Schneider acknowledged to its customers that "***I know some get skittish about security when it comes to cloud resources.*** But if you're honest with yourself, you'll have to admit that . . . top cloud providers know more about how to provide effective cyber security than most companies" and "have business incentives to ensure tight security, and the resources to dedicate to the mission."[90]

84.    One recent report highlighted the risks presented specifically by cloud storage as follows:

---

[88] *See* https://www.oracle.com/legal/privacy/privacy-policy/ (last visited Nov. 21, 2025).

[89] *See* https://www.oracle.com/legal/privacy/services-privacy-policy/ (last visited Nov. 21, 2025).

[90] *See* https://blog.se.com/homes/2015/10/08/4-best-practices-for-utilities-to-keep-customer-data-secure/ (last visited Nov. 21, 2025) (emphasis added).

It is estimated that more than 60% of the world's corporate data is stored in the cloud. ***That makes the cloud a very attractive target for hackers. In 2023, over 80% of data breaches involved data stored in the cloud***. That is not just because the cloud is an attractive target. In many cases, ***it is also an easy target due to cloud misconfiguration*** – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups.[91]

## II.    RHEEM'S BUSINESS

85.    For 100 years Rheem has "engineer[ed] a full line of global air and water products[.]"[92] Rheem has "more than 50 brands around the world" to "deliver local solutions across a global marketplace."[93]

86.    Rheem's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Rheem markets and highlights the strength of its data security practices to entice customers to use Rheem's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Rheem's Privacy Notice proclaims that "[w]e are committed to protecting and respecting your privacy" and "[w]e operate and use reasonable administrative, technical and physical security measures to protect your personal data."[94]

    b.    Rheem's Privacy Notice further provides that ***"[w]e have in particular taken security measures to protect personal data about you*** from accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access, to personal data about you."[95]

---

[91] *See* https://hbr.org/2024/02/why-data-breaches-spiked-in-2023 (emphasis added) (last visited Nov. 18, 2025) (emphases added).

[92] *See* https://www.rheem.com/about/ (last visited Nov. 21, 2025).

[93] *Id.*

[94] *See* https://www.rheem.com/legal/#Privacy-Notice (last visited Nov. 21, 2025).

[95] *Id.*

87.    During the ordinary course of its business, Rheem collects and receives the PII of its employees, former employees, and customers, including Plaintiff Ellis and Class Members.

### III.    TRIMBLE'S BUSINESS

88.    Trimble was founded in Silicon Valley, California in 1978 and touts its "ability to invent and deliver technology solutions" to empower its customers by employing Trimble's products and services to "connect the physical and digital worlds."[96]

89.    Trimble's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Trimble markets and highlights the strength of its data security practices to entice customers to use Trimble's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

a.    Trimble's Privacy Commitment advises that "The Trimble Office of Data Protection works to ensure that your personal data is collected, shared and handled the right way" and that "we make sure that our privacy practices comply with federal and global regulations."[97]

b.    Trimble's Privacy Commitment claims "*[o]ur customers have trusted us with their personal information for over 40 years, and we are committed to ensuring that you feel just as secure today. Your trust is our top priority*."[98]

c.    Trimble's Privacy Notice represents that "*[w]e understand that the security of your personal information is important.* We provide reasonable administrative, technical, and physical security controls to protect your personal information."[99]

---

[96] *See* https://www.trimble.com/en/about (last visited Nov. 21, 2025).
[97] *See* https://www.trimble.com/en/our-commitment/responsible-business/data-privacy-and-security/data-privacy-center/#information-list-2 (last visited Nov. 21, 2025).
[98] *Id.* (emphasis added).
[99] *See* https://www.trimble.com/en/our-commitment/responsible-business/data-privacy-and-security/data-privacy-center/privacy-notice (last visited Nov. 21, 2025).

90.    During the ordinary course of its business, Trimble collects and receives the PII of its employees, former employees, and customers, including Plaintiff Ferrero and Class Members.

## IV.    INTEGRA'S BUSINESS

91.    Integra "was founded in 1989 based on a vision to expand access to promising technology that enables the body to regenerate damaged or diseased tissue."[100] Today, Integra has "grown to be a leading global medical technology company innovating new treatment pathways in surgical, neurologic and regenerative care."[101]

92.    Integra's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Integra markets and highlights the strength of its data security practices to entice customers to use Integra's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

a.    Integra's Privacy Policy claims that "Integra is committed to protecting the privacy and security of personal data."[102]

b.    Integra's Privacy Policy further provides that "[t]he security of your personal information is important to us. We follow generally accepted standards to protect the personal information submitted to us, both during transmission and once it is received."[103]

c.    Integra's Privacy Policy also provides that "[w]e use reasonably effective physical, administrative and technical mechanisms to prevent the loss, misuse, unauthorized access, disclosure, alteration or destruction of your personal information."[104]

d.    Finally, Integra's Privacy Policy provides that "[p]ersonal data will be protected from loss, unauthorized access, destruction, use,

---

[100] *See* https://www.integralife.com/who-we-are (last visited Nov. 21, 2025).
[101] *Id.*
[102] *See* https://www.integralife.com/privacy (last visited Nov. 21, 2025).
[103] *Id.*
[104] *Id.*

modification, or disclosure via encryption, secure data storage and handling procedures, access controls and regular security audits."[105]

93.    During the ordinary course of its business, Integra collects and receives the PII of its employees, former employees, and customers, including Plaintiffs Sampson and Greco and Class Members.

## V.    MILGARD'S BUSINESS

94.    Milgard was founded in Tacoma, Washington in 1958 and, today, helps customers "find beautiful, functional, and long-lasting windows and patio doors[.]"[106]

95.    Milgard's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following illustrates how Milgard markets and highlights the strength of its data security practices to entice customers to use Milgard's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Milgard's Privacy Notice explains that Milgard has "put in place controls designed to help safeguard the personal information we collect from you." [107]

96.    During the ordinary course of its business, Milgard collects and receives the PII of its employees, former employees, and customers, including Plaintiff Martel and Class Members.

## VI.    ENVOY AIR'S BUSINESS

97.    Established in 1998 and operating under the name Envoy Air since 2014, Envoy Air is a regional airline owned by American Airlines, which "operates a fleet of over 180 aircraft, serving more than 160 destinations with 1,000 daily flights."[108]

---

[105] *Id.*
[106] *See* https://www.milgard.com/about (last visited Nov. 21, 2025).
[107] *See* https://www.milgard.com/content/privacy-notice (last visited Nov. 21, 2025).
[108] *See* https://www.envoyair.com/our-company/ (last visited Nov. 21, 2025).

98.    Envoy Air's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Envoy Air markets and highlights the strength of its data security practices to entice customers to use Envoy Air's services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Envoy Air's Privacy Policy proclaims that "Envoy is committed to protecting the security of your personal information. When we collect, use, process, disclose or transfer your personal information, we take reasonable steps to ensure that it is treated securely and in accordance with this Privacy Policy."[109]

    b.    Envoy Air's Privacy Policy further provides that "[w]henever and wherever we collect, process or use personal information, we apply appropriate technical, physical and administrative safeguards and access restrictions to secure that information in accordance with this Privacy Policy in order to prevent unauthorized access and use, unlawful processing, unauthorized or accidental loss, destruction, or damage to that information."[110]

99.    During the ordinary course of its business, Envoy Air collects and receives the PII of its employees, former employees, and customers, including Plaintiff Ellis and Class Members.

## VII.    EMERSON'S BUSINESS

100.    Emerson was founded in St. Louis, Missouri in 1890 and touts that today it has "grown from a regional manufacturer into a global technology solutions powerhouse."[111] Emerson offers its customers a wide range of products ranging from automation software to electrical and lighting.[112] Emerson also offers its customers a myriad of cybersecurity products and services.[113]

---

[109] *See* https://www.envoyair.com/careers/careers-privacy-policy-for-envoy-air-inc-job-applicants-external-applicants-only/ (last visited Nov. 21, 2025).
[110] *Id.*
[111] *See* https://www.emerson.com/en-us/about-us/company-history (last visited Nov. 21, 2025).
[112] *See* https://www.emerson.com/en-us (last visited Nov. 21, 2025).
[113] *See* https://www.emerson.com/en-us/expertise/automation/cybersecurity (last visited Nov. 21, 2025).

101.    Emerson's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Emerson markets and highlights the strength of its data security practices to entice customers to use Emerson's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Emerson's Privacy Notice provides that "[w]e maintain appropriate technical and organizational measures to protect your Personal Data, ***including assuring that third-party service providers who access or handle Personal Data on our behalf and affiliates maintain such safeguards***. We seek to encrypt credit card numbers from e-commerce transactions conducted on our websites using secure socket layer ('SSL') technology."[114]

    b.    During a March 2019 panel, Emerson's Director of Product Security discussed the importance of cybersecurity to digital transformation.[115]

    c.    During a 2018 conference, Emerson's Guardian and Cybersecurity Business Development Manager offered "Practical Tips for System Security" to attendees with an objective of "provid[ing] system owners and users with practical approaches for truly securing systems[.]"[116]

102.    During the ordinary course of its business, Emerson collects and receives the PII of its employees, former employees, and customers, including Plaintiff Molina and Class Members.

---

[114] *See* https://www.emerson.com/en-us/privacy-notice (last visited Nov. 21, 2025).

[115] *See* https://www.emersonautomationexperts.com/2019/cybersecurity/energy-infrastructure-cybersecurity/#xd_co_f=OTJkNTA0MjctZGNlMy00NDI4LTg2YmUtNmNjOWQ2Y2E2YjVi~ (last visited Nov. 21, 2025).

[116] *See* https://www.emersonautomationexperts.com/2018/cybersecurity/practical-tips-system-security/#xd_co_f=OTJkNTA0MjctZGNlMy00NDI4LTg2YmUtNmNjOWQ2Y2E2YjVi~ (last visited Nov. 21, 2025).

## VIII.    MICHELIN'S BUSINESS

103.    Michelin was founded in 1829 and expanded to the United States in 1977.[117] Today, Michelin touts itself as " the leading mobility company and manufacturer of life-changing composites and experiences."[118]

104.    Michelin's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Michelin markets and highlights the strength of its data security practices to entice customers to use Michelin's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Michelin's Legal & Privacy Center claims that "[y]our privacy is important to us."[119]

    b.    Michelin's Privacy Notice provides that "We use physical, technical, and administrative security measures designed to mitigate the potential for the unauthorized access, use, communication/disclosure, or alteration of your personal data."[120]

105.    During the ordinary course of its business, Michelin collects and receives the PII of its employees, former employees, and customers, including Plaintiff Reynolds and Class Members.

## IX.    MKS'S BUSINESS

106.    MKS was founded in 1961 and has grown "[f]rom a single pressure measurement instrument . . . to be a key developer and supplier of critical instruments, subsystems, and systems for Semiconductor and Advanced Markets."[121] MKS has acquired, at least, twenty companies since

---

[117] *See* https://www.michelin.com/en/group/heritage (last visited Nov. 25, 2025).
[118] *See* https://michelinmedia.com/about/ (last visited Nov. 25, 2025).
[119] *See* https://www.michelinman.com/legal-privacy-center (last visited Nov. 25, 2025).
[120] *See* https://www.michelinman.com/legal-privacy-center/privacy-notice (last visited Nov. 25, 2025).
[121] *See* https://www.mks.com/pr/650 (last visited Nov. 21, 2025).

2001 and has over 100,000 business customers across the world.[122]

107.    MKS's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how MKS markets and highlights the strength of its data security practices to entice customers to use MKS's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

  a. MKS's Privacy Statement claims that MKS "recognizes the importance of data privacy to our customers, suppliers, potential employees and other individuals visiting our website or providing us with personal data in connection with our products and services."[123]

  b. MKS's Privacy Statement further provides that *"[t]o prevent unauthorized access, maintain data integrity and ensure that your information is used only in connection with legitimate purposes, we have established certain technical, management and operational security controls to safeguard and secure the personal data that we process.* We also take steps to safeguard information according to established industry practices and periodically evaluate our current practices against new technologies for methods of protecting information."[124]

  c. MKS's Privacy Statements promises that: "[p]ersonal data that is transmitted to us via our website is stored behind our secure firewalls, which we maintain and update regularly;" "[w]e deploy technologies that scan for potential viruses and malware for inbound and outbound communications to avoid unauthorized access to our networks and databases;" and "[*w]e evaluate our external vendors from a security perspective and require certain technical thresholds be maintained to the extent that such vendors will have access to or otherwise manage a system or network containing personal data*."[125]

---

[122] *Id.*

[123] *See* https://www.mks.com/privacy (last visited Nov. 21, 2025).

[124] *Id.* (emphasis added).

[125] *Id.* (emphasis added).

108.    During the ordinary course of its business, MKS collects and receives the PII of its employees, former employees, and customers, including Plaintiff Rosenboim and Class Members.

## X.    SCHNEIDER'S BUSINESS

109.    Schneider was founded in France and opened in the United States in 1902.[126] Today, Schneider touts itself as "a global energy technology leader, driving efficiency and sustainability by electrifying, automating, and digitalizing industries, businesses, and homes."[127]

110.    Schneider's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Schneider markets and highlights the strength of its data security practices to entice customers to use Schneider's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Schneider's Privacy Policy claims, "Schneider Electric is committed to protecting your privacy and personal information" and that "***Schneider Electric strongly supports the fundamental rights to privacy and data protection*** as well as compliance with national and international privacy laws."[128]

    b.    Schneider's Privacy Policy further provides that it "complies with widely recognized key data protection principles (fairness, purpose limitation, data quality, data retention, compliance with individuals' rights, security) and takes reasonable measures for the security of personal information."[129]

    c.    Schneider's Privacy Policy promises that it takes "appropriate technical, physical, and organizational measures to prevent

---

[126] *See* https://www.se.com/us/en/about-us/company-profile/history/schneider-electric-history/; *and* https://www.facebook.com/SchneiderElectricUS/posts/yesterday-at-automate2025-we-celebrated-schneider-electrics-journey-in-us-automa/1123967976440809/ (last visited Nov. 21, 2025).

[127] *See* https://www.se.com/us/en/about-us/company-profile/ (last visited Nov. 21, 2025).

[128] *See* https://www.se.com/us/en/about-us/legal/data-privacy/ (last visited Nov. 21, 2025) (emphasis added).

[129] *Id.*

unauthorized access, unlawful processing, and unauthorized or accidental loss, destruction, or damage to personal information".[130]

d.     Schneider's Privacy Policy further advises customers that:"[w]e offer the use of secure servers to enable you to place orders or to access your account information"; "[w]e sensitize our employees on proper use and handling of personal information"; and "[w]e also require our service providers to maintain compliant security measures."[131]

e.     In an October 8, 2015, blog post about best practices for data security, Schneider advised customers ***"[t]o ensure security, partner wisely and build to industry standards***."[132] Schneider advised customers "these days the simplest way [to protect data] may be to outsource part of the security, in effect, by using a cloud-based platform to host your compute resources and databases. That's the strategy the North American Wiser team at Schneider Electric is following."[133]

111.     During the ordinary course of its business, Schneider collects and receives the PII of its employees, former employees, and customers, including Plaintiff Sanchez and Class Members.

## XI.    LOGITECH'S BUSINESS

112.     Logitech was founded in 1981 and quickly expanded to Silicon Valley, California.[134] Today, Logitech "design[s] software-enabled hardware solutions that drive superior performance when gaming and superior productivity while at work."[135]

---

[130] *Id.*

[131] *Id.*

[132] *See* https://blog.se.com/homes/2015/10/08/4-best-practices-for-utilities-to-keep-customer-data-secure/ (last visited Nov. 21, 2025).

[133] *Id.*

[134] *See* https://www.logitech.com/en-us/about (last visited Nov. 21, 2025).

[135] *Id.*

113.    Logitech Global-e "is the sales facilitation and e-commerce partner of the Logitech entity  operating [Logitech's] e-commerce web-store . . .  where the products or services were made available to you for purchase through the checkout[.]"[136]

114.    Logitech's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Logitech markets and highlights the strength of its data security practices to entice customers to use Logitech's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

    a.    Logitech's Privacy Policy claims that "[y]our privacy is essential to Logitech" and that Logitech is "committed to the protection of your personal data."[137]

    b.    Logitech's Privacy Policy further provides that "[w]e use TLS certificates, encryption, data access limitations, anti-virus software, and firewalls to reduce the risk of unauthorized access to personal data."[138]

    c.    Logitech's Global-e Privacy Policy explains that "Global-e US Inc. our US subsidiary, complies with the EU-U.S. Data Privacy Framework (EU-U.S. DPF) and the UK Extension to the EU-U.S. DPF, as set forth by the U.S. Department of Commerce and will be further liable in cases of onward transfers of your personal data to third parties (including our Service Providers). Global-e US Inc. has certified to the U.S. Department of Commerce that it adheres to the EU-U.S. Data Privacy Framework Principles[.]"[139]

    d.    Logitech's Vendor Information Security Requirements claims that Logitech "require all of its vendors, service providers and other business partners ("You" or "Vendor") to maintain a comprehensive written information security program ("Information Security Program") that includes technical, physical and organizational measures to ensure the confidentiality, security, integrity, and

---

[136] *See* https://www.logitech.com/en-us/legal/tos-global-e.html#:~:text=Global%2De%20is%20the%20sales,checkout%20(%22Product%22) (last visited Nov. 21, 2025).

[137] *See* https://www.logitech.com/en-us/legal/privacy-policy (last visited Nov. 21, 2025).

[138] *Id.*

[139] *See* https://www.logitech.com/en-us/legal/privacy-global-e.html (last visited Nov. 21, 2025).

availability of information provided by Logitech, Logitech's affiliates, and its and their employees, representatives, contractors, customers and Vendors (collectively, "Logitech Data") and to protect against unauthorized access, use, disclosure, alteration or destruction of Logitech Data."[140]

115. During the ordinary course of its business, Logitech collects and receives the PII of its employees, former employees, and customers, including Plaintiff Wand and Class Members.

## XII. DEFENDANTS OBTAIN, COLLECT, USE, AND DERIVE A BENEFIT FROM THE PII OF PLAINTIFFS AND CLASS MEMBERS

116. Defendants obtain, collect, use, and derive a benefit from Plaintiffs' and Class Members' PII. Defendants use this PII to provide goods and services, making a profit therefrom. Defendants would not be able to obtain revenue if not for the acceptance and use of this PII.

117. By collecting Plaintiffs' and Class Members' PII, either directly or indirectly, Defendants assumed legal and equitable duties to Plaintiffs and Class Members to protect and safeguard their PII from unauthorized access and intrusion.

118. Defendants recognize this duty in their respective Privacy Policies, Statements and Notices, and marketing to their customers and employees.

119. Defendants' assurances of maintaining high standards of cybersecurity demonstrate they recognize they have a duty to use reasonable measures to protect the PII they collect and maintain.

120. Defendants violated their privacy statements and failed to adopt reasonable and appropriate security practices and procedures, including administrative, physical security, and technical controls, to safeguard Plaintiffs' and Class Members' PII.

---

[140] *See* https://www.logitech.com/en-us/legal/vendor-information-security-requirements.html (last visited Nov. 21, 2025).

121.    As a result, Plaintiffs' and Class Members' PII was accessed and stolen from Defendants' inadequately secured data systems in massive and preventable Data Breach.

## XIII.  THE DATA BREACH

122.    As set forth in detail in paragraphs 15-32, the Data Breach at issue was highly preventable and foreseeable. Instead of preventing this foreseeable Data Breach, Oracle and the Spoke Defendants allowed cybercriminals to systematically exfiltrate Plaintiffs' and Class Members PII, between in and around July and October 2025.

123.    Indeed, after becoming aware of the attacks in July 2025, Oracle's July 2025 patch failed to provide a viable solution and protection for the CVE-2025-61882 vulnerability exploited by the cybercriminals, until Oracle's October 2025 patch – well after several Spoke Defendants and other Oracle customers were raided by cybercriminals in August and September 2025.

124.    Unlike similarly impacted companies like the Washington Post, GlobalLogic and Cox Enterprises, none of the Defendants have provided any notice to victims or states attorneys generals concerning the Data Breach.

125.    Instead, Defendants failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access and exploitation from a foreseeable Data Breach and have chosen a strategy of silence – while Plaintiffs and unaware Class Members face the consequences of the Data Breach.

## XIV.  RELEVANT INDUSTRY STANDARDS AND REGULATIONS FOR DATA SECURITY

### A.  United States Federal Trade Commission Guidelines

126.    The United States Federal Trade Commission ("FTC") has issued numerous forms of guidance and taken enforcement actions that outline the data security industry standards applicable to Defendants.

127.    For example, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security for consumer PII violates the FTC Act's prohibition against "unfair or deceptive acts."[141]

128.    In 2016, the FTC published guidance entitled *Protecting Personal Information: A Guide for Business* (the "FTC 2016 Guidance"). The FTC 2016 Guidance:

a.  Stresses the importance of "[c]ontrol[ling] access to sensitive information" and expressly encourages businesses to "[c]onsider using multi-factor authentication, such as requiring the use of a password and a code sent by different methods."

b.  Emphasizes that companies should respond appropriately when credentials are compromised, providing that businesses should "[r]equire password changes when appropriate—for example, following a breach."

c.  Instructs companies to restrict data access privileges by "[s]cal[ing] down access to data" and ensuring that "each employee should have access only to those resources needed to do their particular job."

d.  Warns companies that their data security practices depend on their personnel, which "includ[e] contractors" and encourages companies to "investigate [contractor] data security practices and compare their standards" and "verify compliance" with written security expectations.

e.  Recommends that companies encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems and respond to security incidents.

f.  Advises companies not to maintain PI longer than necessary, not to collect more PI than necessary, to use industry-tested methods for data security, and monitor and respond to suspicious activity.[142]

129.    In 2021, the FTC amended its "Safeguards Rule" that applies to financial institutions, including retailers that issue their own credit cards to consumers and companies that

---

[141] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp.3d 374, 407 (E.D. Va. 2020) (citing *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).
[142] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf (last visited Nov. 18, 2025).

bring together buyers and sellers of products and services.[143] The Safeguard Rule expressly requires covered businesses to "[i]mplement multi-factor authentication ["MFA"] for anyone accessing customer information on [the business's] system," to "[i]mplement and periodically review access controls [to] [d]etermine who has access to customer information and reconsider on a regular basis whether they still have a legitimate business need for it," and to "[i]mplement procedures and controls to monitor when authorized users are accessing customer information on your system and detect unauthorized access."[144]

130.    In February 2023, the FTC published an article entitled *Security Principles: Addressing underlying causes of risk in complex systems.* The article highlighted the importance of MFA, stating that it "is widely regarded as a critical security practice because it means a compromised password alone is not enough to take over someone's account."[145]

## B.    Data Breaches Are Preventable

131.    Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise PII, Defendants' approach to maintaining the privacy of Plaintiffs' and Class Members' PII was inadequate, unreasonable, negligent, and reckless. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendants were maintaining and transferring for Plaintiffs and Class Members, such as encrypting the information or deleting it when no longer needed, limiting employee access keys to PII, and adequately training their employees, which caused the exposure of Plaintiffs' and Class Members' PII.

---

[143] 16 C.F.R. §§ 314.2(h)(2)(i), (xiii).

[144] *See* https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last visited Nov. 18, 2025).

[145] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/02/security-principles-addressing-underlying-causes-risk-complex-systems (last visited Nov. 18, 2025).

132.    As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[146]

133.    Defendants could have prevented this Data Breach. They could have and should have implemented measures—as recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- **Enable strong spam filters** to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with least privilege in mind. If

---

[146] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Nov. 18, 2025).

a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[147]

134. To prevent and detect cyberattacks and ransomware attacks, Defendants could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**

  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
  - Remove privileged credentials

---

[147] *Id.*

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**

    - Ensure collaboration among security operations, security admins, and information technology admins to configure servers and other endpoints securely

- **Build credential hygiene**

    - Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least privilege**

    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**

    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications.[148]

135.    Similarly, Defendants could and should have implemented measures—also recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers

- Keep only what you need for your business.

---

[148] *See* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 18, 2025).

- Protect the information that you keep.

- Properly dispose of information you no longer need. Create a plan to respond to security incidents.[149]

136.    Finally, Defendants could and should have implemented the following measures—also recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions**. Prioritize timely patching of internet-facing servers that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services**. If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured and security features are enabled**. For example, disable ports and protocols not being used for business purposes.[150]

137.    Because Defendants were collecting, storing, and transferring highly sensitive PII belonging to Plaintiffs and Class Members, they could—and should—have implemented all of the above measures to prevent and detect cyberattacks.

---

[149] *See* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Nov. 18, 2025).
[150] *See* https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last visited Nov. 18, 2025).

138.    The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves accessing and acquiring the PII of Plaintiffs and millions of Class Members.

### C.    Industry Standards Specific to Cloud Data Storage

139.    In addition to the general data security standards described above, numerous authorities have issued guidance specific to cloud data storage, defining the roles and responsibilities of cloud service providers (like Oracle) and their customers (like Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech).

### i.    Governmental Authorities

140.    In June 2020, the FTC published an article titled, *Six steps toward more secure cloud computing.* The article warned: "As cloud computing has become business as usual for many businesses, frequent news reports about data breaches and other missteps should make companies think carefully about how they secure their data." The article expressly highlighted the importance of MFA in protecting consumer data stored on cloud services, recommending businesses: "Require multi-factor authentication and strong passwords to protect against the risk of unauthorized access."[151]

141.    In March 2023, the FTC issued a Request for Information seeking public comment on "Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security."[152] After reviewing over 100 public comments on the issue, the FTC published a report in November 2023 titled, *Cloud Computing RFI: What we heard and learned.* The report expressly

---

[151] https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing (last visited Nov. 18, 2025).
[152] https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data (last visited Nov. 18, 2025).

flagged the room for improvement in cloud security as follows: "[A] a number of commenters argued there is a great deal of room for improvement in cloud security; that default security configurations could be better; and that the "shared responsibility" model for cloud security often lacks clarity, which can lead to situations where neither the cloud provider nor the cloud customer implements necessary safeguards."[153]

142.    In March 2024, the U.S. National Security Agency ("NSA") and Cybersecurity & Infrastructure Agency ("CISA") issued a joint publication titled, *Use Secure Cloud Identity and Access Management Practices.*[154] The publication warned, "[a]s organizations continue to migrate to using cloud environments, these environments are becoming increasingly valuable targets for malicious cyber actors[.]"[155] The publication made numerous recommendations relevant to MFA, rotating credentials, and restricting allow lists to ensure only necessary privileges are granted to users:

a. **Multifactor authentication**. Single-factor authentication (e.g., password or PIN only) based account access is susceptible to credential theft, forgery, and reuse across multiple systems. Cloud accounts are generally globally accessible; thus they are more susceptible to certain types of single-factor authentication weaknesses. Multifactor authentication (MFA) boosts account security, better resisting compromise by enhancing user verification methods. MFA requires two or more factors for login: something the user knows, has, or is. Typically this is implemented using a password and a second factor usually based on a randomly seeded numeric token, a biometric option (such as a fingerprint or facial recognition), or a physical token (unique hardware-based identifier: smartcard, Common Access Card, etc.).

b. Periodically audit IAM configurations to confirm only necessary privileges are granted to users. Many CSPs [Cloud Service Providers] offer services that will track unused privileges to help admins tailor

---

[153] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/11/cloud-computing-rfi-what-we-heard-learned (last visited Nov. 18, 2025).
[154] https://media.defense.gov/2024/Mar/07/2003407866/-1/-1/0/CSI-CloudTop10-Identity-Access-Management.PDF (last visited Nov. 18, 2025).
[155] *Id.*

accounts to the least privileges users need to accomplish their day-to-day responsibilities.

143.    Also in March 2024, NSA separately issued a publication titled, *NSA's Top Ten Cloud Security Mitigation Strategies.*[156] The publication emphasized the importance of MFA, credential rotation, and restricted allow lists as follows for customers using cloud data services as follows:

> Proper identity and access management (IAM) are critical to securing cloud resources. Malicious actors can compromise accounts using phishing techniques, exposed credentials, or weak authentication practices to gain initial access into cloud tenants. They can also exploit overly broad access control policies to penetrate further into the environment, gaining access to sensitive resources. To prevent this, cloud users should use secure authentication methods such as phishing-resistant multifactor authentication (MFA) and properly managed temporary credentials. Access control policies should be carefully configured to ensure users are granted the least privileges necessary. Separation of duties should be implemented to protect especially sensitive operations and resources.[157]

### ii.    Industry Standards

144.    The PCI Data Security Council issued an April 2018 supplement to the PCI DSS, titled Cloud Computing Guidelines.[158] The PCI Cloud Computing Guidelines again emphasize the importance of MFA, providing: "PCI DSS Requirement 8.2.2 requires multi-factor authentication for all remote network access to the CDE [cardholder data environment], and when public cloud services are part of a Customer's CDE, all such access will be considered remote access and will require multi-factor authentication.

---

[156] https://media.defense.gov/2024/Mar/07/2003407860/-1/-1/0/CSI-CloudTop10-Mitigation-Strategies.PDF (last visited Nov. 18, 2025).
[157] *Id.*
[158] https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited Nov. 18, 2025).

145.    The Guidelines include a section titled Intrusion Detection Systems (IDS) / Intrusion Prevention Systems (IPS), which provides: "As the Customer's access to network level data can be severely restricted in cloud environments, the responsibility for tracking intrusions at the network layer will often reside with the Provider, as the only entity that has sufficient privileges to do this across the underlying infrastructure." The guidelines go on to note that for SaaS providers such as Oracle: "Since customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[159]

146.    The Center for Internet Security ("CIS") is a nonprofit organization that develops globally recognized best practices for securing IT systems and data. In March 2022, CIS issued a publication entitled *CIS Controls v8 Cloud Companion Guide* that provided guidance on security best practices for customers using cloud services.[160] The guidance made the following recommendations emphasizing the importance of MFA and revoking access to stale credentials:

    a. Disable Dormant Accounts. Delete or disable any dormant accounts after a period of 45 days of inactivity, where supported.

    b. Establish an Access-Revoking Process. Establish and follow a process, preferably automated, for revoking access to enterprise assets, through disabling accounts immediately upon termination, rights revocation, or role change of a user. Disabling accounts, instead of deleting accounts, may be necessary to preserve audit trails.

    c. Require MFA for Administrative Access. Require MFA for all administrative access accounts, where supported, on all enterprise assets, whether managed on-site or through a third-party provider.

---

[159] *See* https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited Nov. 18, 2025).
[160] https://www.cisecurity.org/insights/white-papers/cis-controls-v8-cloud-companion-guide (last visited Nov. 18, 2025).

147.    ISO/IEC 27017 is an international standard that "provides controls and implementation guidance for both cloud service providers and cloud service customers."[161] Control 9.2.3 specifically highlights that cloud service customers (like AMERGIS) should use MFA and cloud service providers (like Oracle) should provide MFA capabilities as follows:

| Cloud service customer | Cloud service provider |
| --- | --- |
| The cloud service customer should use sufficient authentication techniques (e.g., multi-factor authentication) for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service according to the identified risks. | The cloud service provider should provide sufficient authentication techniques for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service, according to the identified risks. For example, the cloud service provider can provide multi-factor authentication capabilities or enable the use of third-party multi-factor authentication mechanisms. |

## XV.    DEFENDANTS COLLECT AND STORE PLAINTIFFS' AND CLASS MEMBERS' VALUABLE PII

### A.  Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' PII

148.    Defendants acquire, collect, and store a significant amount of PII belonging to Plaintiffs and Class Members.

149.    For example, as a condition of employment with Defendants, Plaintiffs and Class Members were required to entrust their highly sensitive PII to Defendants, and in turn, either directly or indirectly, to Oracle.

150.    Further, as a condition of utilizing or purchasing Defendants' products and services, Class Members were required to entrust their highly sensitive PII to Defendants, and in turn, either directly or indirectly, to Oracle.

---

[161] https://www.amnafzar.net/files/1/ISO%2027000/ISO%20IEC%2027017-2015.pdf (last visited Nov. 18, 2025).

151.    By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

152.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Defendants absent a commitment to safeguard that information.

153.    Upon information and belief, Defendants promised, while collecting PII from Plaintiffs and Class Members, to provide confidentiality and adequate security for their data through their applicable Privacy Policies, Statements and Notices, and through other disclosures in compliance with statutory privacy requirements.

154.    Plaintiffs and Class Members relied on Defendants to keep their PII confidential and securely maintained, to use their PII for business purposes only, and to make only authorized disclosures of their PII. The Data Breach occurred because Defendants failed to honor their commitments.

B.    **Value of Private Information**

155.    The FTC defines "identity theft" as "a fraud committed or attempted using the identifying information of another person without authority."[162] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number,

---

[162] 17 C.F.R. § 248.201 (2013).

alien registration number, government passport number, employer or taxpayer identification number."[163]

156.    The PII of individuals remains of high value to criminals, as evidenced by the prices paid for PII on the dark web. Numerous sources cite dark-web pricing for stolen identity credentials.[164]

157.    The PII compromised in the Data Breach is significantly more valuable than the loss of, for example, payment card information at the point of sale in a retailer data breach because, there, victims can cancel or close payment card accounts. The information compromised in these Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and Social Security numbers.

158.    Among other forms of fraud, identity thieves can obtain driver's licenses, government benefits, medical services, and housing, and even provide false information to police.

159.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when the harm occurs versus when it is discovered and also between when the PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[165]

---

[163] *Id.*

[164] *See* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Nov. 18, 2025).

[165] *See* https://www.gao.gov/assets/gao-07-737.pdf (last visited Nov. 18, 2025).

160.    When combined with other publicly available data, any PII element can be used to build full identity profiles, known as "Fullz" packages, which are frequently exploited in financial fraud schemes. "Fullz" is fraudster-speak for data that includes a victim's information, including name, address, SSN, date of birth, and more.

161.    With Fullz packages, cybercriminals can cross-reference two (or more) sources of PII to marry unregulated data available elsewhere (e.g., address or phone number) to criminally stolen data to assemble shockingly accurate and complete dossiers on individuals.

162.    Compromised PII, whether alone or as part of a Fullz package, is highly valuable to cybercriminals, who can use it to engage in a wide range of fraudulent activities, including committing unemployment insurance fraud, opening unauthorized financial accounts, and applying for government benefits.

163.    This type of identity theft renders any compromised data—including seemingly innocuous PII, such as name and contact information—valuable. In the wrong hands, up-to-date names, addresses, phone numbers, and email addresses can be used to update, validate, and verify Fullz packages, which can then be used for nefarious purposes.

164.    For example, a criminal actor can use an up-to-date Fullz package to bypass identity verification tools—which are often used in financial transactions (like loan applications), background checks, etc.—without detection. In a typical identity verification system, a user submits their PII, like their name, addresses, or date of birth. That customer-submitted PII is then cross-checked against "a trusted data set," including those from "credit bureaus, official government documents or mobile operator databases."

165.    Thus, with an up-to-date Fullz package—which might include seemingly harmless information, like the identity theft victim's name and current address—a cybercriminal has the

victim's up-to-date PII, which will match the victim's information from trusted data sources, like the credit bureaus. With this information, the criminal can then successfully pass identity verification systems without raising any red flags. In this way, Fullz packages, which are made possible by up-to-date and compromised elements of PII, enable fraudsters to carry out various forms of identity theft, including taking out fraudulent loans.

166.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

## XVI.    DEFENDANTS EACH OWED A DUTY OF CARE TO PLAINTIFFS AND CLASS MEMBERS

167.    Plaintiffs' and Class Members' PII was stored on Defendants' platforms, networks, systems, or products at the time of the Data Breach.

168.    Defendants owed common law duties to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in Defendants' possession from being compromised, accessed, stolen, or misused by unauthorized parties.

### A.  Oracle Breached its Duty of Care to Plaintiffs and Class Members

169.    Oracle's duty of reasonable care is established by the nature of its business, which is made possible by its OCI, which Oracle claims: "helps organizations reduce the risk of security threats for cloud workloads. With simple, prescriptive, and integrated security capabilities **built into the OCI platform**, Oracle helps customers easily adopt and secure their cloud infrastructure, data, and applications."[166] In offering and undertaking these services to customers via "built in"

---

[166] *See* https://www.oracle.com/security/cloud-security/ (last visited Nov. 21, 2025).

aspects of the OCI, Oracle had a duty to exercise reasonable care to safeguard Plaintiffs' and Class Members' PII because it was foreseeable that failure to do so would cause them injury.

170.    Oracle's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard the PII it stored.

171.    Oracle's duty of reasonable care is also established by its own marketing statements and Privacy Policies, which hold out its secure provision of services.

172.    Oracle's duty of reasonable care is also established by relevant common law.

173.    Oracle breached its duties to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII by failing to implement adequate data security practices, which caused the Data Breach.

174.    Oracle was negligent and breached its duty of care to Plaintiffs and Class Members to protect their PII from exploitation via customers' use of Oracle's cloud-based platforms, software, applications, and databases.

175.    Oracle's breach of its duty of care caused the Data Breach, because had Oracle lived up to its shared responsibility commitments to its customers, the Data Breach could have been prevented.

176.    Oracle's data security failings also constitute an unfair trade practice. As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of PII violates the FTC Act's prohibition on "unfair and deceptive acts."

177.    Oracle's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiffs and Class Members.

178.    Oracle is liable for the injuries suffered by Plaintiffs and Class Members by virtue of its role as the proprietary owner and administrator of the cloud-based software, platforms, applications, and databases, which were used to manage, facilitate the transfer of, and store the data of its affected customers, including Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech, as well its shared responsibility with its customers to protect PII.

**B.    Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech Breached their Duty of Care to Plaintiffs and Class Members**

179.    At the time of the Data Breach, Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech failed to maintain reasonable data security measures and comply with FTC guidance and other relevant industry standards. These data security failings included the Spoke Defendants' failures to adequately select or oversee their third-party vendor, Oracle, to which each Spoke Defendant entrusted the PII of its customers and/or employees.

180.    The Spoke Defendants' data security failings enabled the Data Breach. Without basic protections, cybercriminals were able to exfiltrate Plaintiffs' and Class Members' PII.

181.    The Spoke Defendants, through these data security failings, breached express representations in their Privacy Policies, Notices and Statements.

182.    The Spoke Defendants also breached implied commitments to protect the PII of their customers and employees, including Plaintiffs and Class Members, by virtue of mandating that customers and employees provide their sensitive PII as a condition of using or purchasing the Spoke Defendants' products and services and/or being employed by the Spoke Defendants.

183.    The Spoke Defendants' data security shortcomings also constitute a breach of their duty of care to protect the PII of customers and employees, including Plaintiffs and Class Members.

**C.    Plaintiffs and Class Members have and will continue to suffer injuries because of the Data Breach**

184.    Plaintiffs and Class Members have and will continue to suffer the following forms of injury fairly traceable to the Data Breach.

185.    The disclosure of Plaintiffs' and Class Members' PII has created a substantial risk that their data will be misused. That cybercriminals now control that data demonstrates this risk.

186.    Plaintiffs and Class Members have and will continue to reasonably expend significant time and costs mitigating the substantial risk of data misuse. These mitigation steps include Plaintiffs and Class Members now expending time and effort to place "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing, or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

187.    Plaintiffs and Class Members have and may suffer lost property value of their PII when Defendants allowed their PII to fall into the hands of cybercriminals, who could—and likely will—freely sell or distribute it at any time.

188.    Defendants breached their express and implied contractual commitments to Plaintiffs and Class Members to protect their PII.

189.    The breach of a contractual obligation constitutes an injury to Plaintiffs and Class Members and provides a basis for a lawsuit to enforce the contractual terms.

190.    In breaching their contractual commitments, Defendants further injured Plaintiffs and Class Members by depriving them of the benefit of the bargain they had reached.

191.    For example, Plaintiffs and Class Members entered into agreements with the Spoke Defendants based on express and implied representations that their PII would be protected—which they factored into the value of that exchange. By failing to maintain reasonable data security measures to protect that PII, Defendants deprived Plaintiffs and Class Members of the benefit of the bargain by which they were owed the value of reasonable data security measures that were not provided.

192.    Plaintiffs and Class Members have also been injured by an invasion of their privacy rights because their confidential PII was disclosed to cybercriminals, and potentially others if and when the cybercriminals disclose it on the dark web.

193.    In addition, Plaintiffs and Class Members have and will continue to suffer emotional distress and anxiety resulting from the Data Breach and fear the substantial risk of identity theft and loss of privacy. Plaintiffs and Class Members understand that their PII cannot now be clawed back from the dark web.

## XVII.  PLAINTIFFS' INDIVIDUAL EXPERIENCES

### A.    Plaintiff Smith

194.    Ms. Smith is a former employee of Oracle who was required to provide her PII, and that of her immediate family, as a condition of her employment with Oracle.

195.    Upon information and belief, Ms. Smith's PII was stolen from Oracle's systems, networks, and/or software in the Data Breach.

196.    Oracle possessed Ms. Smith's PII before, during, and after the Data Breach.

197.    Because of the Data Breach, Ms. Smith's confidential PII is in the hands of cybercriminals. As such, Ms. Smith and other Class Members are at imminent risk of identity theft and fraud.

198.    As a result of the Data Breach, Ms. Smith must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

199.    Ms. Smith places significant value on the security of her PII and does not readily disclose it. Ms. Smith has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

200.    Ms. Smith has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Ms. Smith has experienced a sharp increase in targeted phishing emails that incorporate information she provided to Oracle.

201.    Ms. Smith has a continuing interest in ensuring that her PII, which, upon information and belief, remains in the possession of Oracle, is protected and safeguarded from future data breaches. Absent court intervention, Ms. Smith's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

202.    Ms. Smith suffered actual injury as a result of the unauthorized access and disclosure of her PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b)

remains backed up in Oracle's possession and is subject to further unauthorized disclosures so long as Oracle fails to undertake appropriate and adequate measures to protect her PII.

203.    The Data Breach has caused Ms. Smith to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle has still not informed her of key details about the Data Breach.

### B.    Plaintiff Ellis

204.    Mr. Ellis is a former employee of Rheem who was required to provide his PII, and that of his immediate family, as a condition of his employment with Rheem.

205.    Upon information and belief, Mr. Ellis's PII was stolen from Oracle's and Rheem's systems, networks, and/or software in the Data Breach.

206.    Oracle and Rheem possessed Mr. Ellis's PII before, during, and after the Data Breach.

207.    Because of the Data Breach, Mr. Ellis's confidential PII is in the hands of cybercriminals. As such, Mr. Ellis and other Class Members are at imminent risk of identity theft and fraud.

208.    As a result of the Data Breach, Mr. Ellis must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information. Additionally, as a result of the Data Breach, Mr. Ellis placed a credit freeze on his accounts with the credit bureaus.

209.    Mr. Ellis places significant value on the security of his PII and does not readily disclose it. Mr. Ellis has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

210.    Mr. Ellis has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Following the Data Breach, Mr. Ellis received notice that his sensitive personal information has been found on the dark web. Additionally, Mr. Ellis has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Rheem.

211.    Mr. Ellis has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Rheem, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Ellis's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

212.    Mr. Ellis suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Rheem's possession and is subject to further unauthorized disclosures so long as Oracle and Rheem fail to undertake appropriate and adequate measures to protect his PII.

213.    The Data Breach has caused Mr. Ellis to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Rheem have still not informed him of key details about the Data Breach.

**C.    Plaintiff Ferrero**

214.    Ms. Ferrero is a former employee of Trimble who was required to provide her PII, and that of her immediate family, as a condition of her employment with Trimble.

215.    Upon information and belief, Ms. Ferrero's PII was stolen from Oracle's and Trimble's systems, networks, and/or software in the Data Breach.

216.    Oracle and Trimble possessed Ms. Ferrero's PII before, during, and after the Data Breach.

217.    Because of the Data Breach, Ms. Ferrero's confidential PII is in the hands of cybercriminals. As such, Ms. Ferrero and other Class Members are at imminent risk of identity theft and fraud.

218.    As a result of the Data Breach, Ms. Ferrero must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

219.    Ms. Ferrero places significant value on the security of her PII and does not readily disclose it. Ms. Ferrero has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

220.    Ms. Ferrero has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and

impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Ms. Ferrero has experienced a sharp increase in targeted phishing emails that incorporate information she provided to Trimble.

221.    Ms. Ferrero has a continuing interest in ensuring that her PII, which, upon information and belief, remains in the possession of Oracle and Trimble, is protected and safeguarded from future data breaches. Absent court intervention, Ms. Ferrero's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

222.    Ms. Ferrero suffered actual injury as a result of the unauthorized access and disclosure of her PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Trimble's possession and is subject to further unauthorized disclosures so long as Oracle and Trimble fail to undertake appropriate and adequate measures to protect her PII.

223.    The Data Breach has caused Ms. Ferrero to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Trimble have still not informed her of key details about the Data Breach.

### D.    Plaintiff Greco

224.    Mr. Greco is a former employee of Integra who was required to provide his PII, and that of his immediate family, as a condition of his employment with Integra.

225.    Upon information and belief, Mr. Greco's PII was stolen from Oracle's and Integra's systems, networks, and/or software in the Data Breach.

226.    Oracle and Integra possessed Mr. Greco's PII before, during, and after the Data Breach.

227.    Because of the Data Breach, Mr. Greco's confidential PII is in the hands of cybercriminals. As such, Mr. Greco and other Class Members are at imminent risk of identity theft and fraud.

228.    As a result of the Data Breach, Mr. Greco must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

229.    Mr. Greco places significant value on the security of his PII and does not readily disclose it. Mr. Greco has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

230.    Mr. Greco has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Mr. Greco has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Integra.

231.    Mr. Greco has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Integra, is protected and

safeguarded from future data breaches. Absent court intervention, Mr. Greco's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

232.    Mr. Greco suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Integra's possession and is subject to further unauthorized disclosures so long as Oracle and Integra fail to undertake appropriate and adequate measures to protect his PII.

233.    Oracle and Integra still have not informed Mr. Greco of key details about the Data Breach.

### E.    Plaintiff Martel

234.    Ms. Martel is a former employee of Milgard who was required to provide her PII, and that of her immediate family, as a condition of her employment with Milgard.

235.    Upon information and belief, Ms. Martel's PII was stolen from Oracle's and Milgard's systems, networks, and/or software in the Data Breach.

236.    Oracle and Milgard possessed Ms. Martel's PII before, during, and after the Data Breach.

237.    Because of the Data Breach, Ms. Martel's confidential PII is in the hands of cybercriminals. As such, Ms. Martel and other Class Members are at imminent risk of identity theft and fraud.

238.     As a result of the Data Breach, Ms. Martel must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

239.     Ms. Martel places significant value on the security of her PII and does not readily disclose it. Ms. Martel has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

240.     Ms. Martel has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Ms. Martel has experienced a sharp increase in targeted phishing emails that incorporate information she provided to Milgard causing her to change her email address following the Data Breach.

241.     Ms. Martel has a continuing interest in ensuring that her PII, which, upon information and belief, remains in the possession of Oracle and Milgard, is protected and safeguarded from future data breaches. Absent court intervention, Ms. Martel's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

242.     Ms. Martel suffered actual injury as a result of the unauthorized access and disclosure of her PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her PII, which:

(a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Milgard's possession and is subject to further unauthorized disclosures so long as Oracle and Milgard fail to undertake appropriate and adequate measures to protect her PII.

243.    The Data Breach has caused Ms. Martel to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Milgard have still not informed her of key details about the Data Breach.

**F.    Plaintiff Martins**

244.    Mr. Martins is a former employee of Envoy Air who was required to provide his PII, and that of his immediate family, as a condition of his employment with Envoy Air.

245.    Upon information and belief, Mr. Martins's PII was stolen from Oracle's and Envoy Air's  systems, networks, and/or software in the Data Breach.

246.    Oracle and Envoy Air possessed Mr. Martins's PII before, during, and after the Data Breach.

247.    Because of the Data Breach, Mr. Martins's confidential PII is in the hands of cybercriminals. As such, Mr. Martins and other Class Members are at imminent risk of identity theft and fraud.

248.    As a result of the Data Breach, Mr. Martins must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

249.    Mr. Martins places significant value on the security of his PII and does not readily disclose it. Mr. Martins has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

250.    Mr. Martins has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Following the Data Breach, Mr. Martins's PayPal account has experienced fraudulent charges Mr. Martins did not make. Additionally, Mr. Martins has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Envoy Air.

251.    Mr. Martins has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Envoy Air, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Martins's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

252.    Mr. Martins suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Envoy Air's possession and is subject to further unauthorized disclosures so long as Oracle and Envoy Air fail to undertake appropriate and adequate measures to protect his PII.

253.    Oracle and Envoy Air have still not informed Mr. Martins of key details about the Data Breach.

### G.    Plaintiff Molina

254.    Mr. Molina is a former employee of Emerson who was required to provide his PII, and that of his immediate family, as a condition of his employment with Emerson.

255.    Upon information and belief, Mr. Molina's PII was stolen from Oracle's and Emerson's systems, networks, and/or software in the Data Breach.

256.    Oracle and Emerson possessed Mr. Molina's PII before, during, and after the Data Breach.

257.    Because of the Data Breach, Mr. Molina's confidential PII is in the hands of cybercriminals. As such, Mr. Molina and other Class Members are at imminent risk of identity theft and fraud.

258.    As a result of the Data Breach, Mr. Molina must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

259.    Mr. Molina places significant value on the security of his PII and does not readily disclose it. Mr. Molina has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

260.    Mr. Molina has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the

Data Breach. Additionally, Mr. Molina has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Emerson.

261.    Mr. Molina has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Emerson, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Molina's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

262.    Mr. Molina suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Emerson's possession and is subject to further unauthorized disclosures so long as Oracle and Emerson fail to undertake appropriate and adequate measures to protect his PII.

263.    The Data Breach has caused Mr. Molina to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Emerson have still not informed him of key details about the Data Breach.

### H.    Plaintiff Reynolds

264.    Mr. Reynolds is a former employee of Michelin who was required to provide his PII, and that of his immediate family, as a condition of his employment with Michelin.

265.    Upon information and belief, Mr. Reynolds's PII was stolen from Oracle's and Michelin's systems, networks, and/or software in the Data Breach.

266.    Oracle and Michelin possessed Mr. Reynolds's PII before, during, and after the Data Breach.

267.    Because of the Data Breach, Mr. Reynolds's confidential PII is in the hands of cybercriminals. As such, Mr. Reynolds and other Class Members are at imminent risk of identity theft and fraud.

268.    As a result of the Data Breach, Mr. Reynolds must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

269.    Mr. Reynolds places significant value on the security of his PII and does not readily disclose it. Mr. Reynolds has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

270.    Mr. Reynolds has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Mr. Reynolds has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Michelin.

271.    Mr. Reynolds has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Michelin, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Reynolds's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

272.    Mr. Reynolds suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Michelin's possession and is subject to further unauthorized disclosures so long as Oracle and Michelin fail to undertake appropriate and adequate measures to protect his PII.

273.    The Data Breach has caused Mr. Reynolds to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Michelin have still not informed him of key details about the Data Breach.

**I.    Plaintiff Rosenboim**

274.    Mr. Rosenboim is a former employee of MKS who was required to provide his PII, and that of his immediate family, as a condition of his employment with MKS.

275.    Upon information and belief, Mr. Rosnboim's PII was stolen from Oracle's and MKS's systems, networks, and/or software in the Data Breach.

276.    Oracle and MKS possessed Mr. Rosenboim's PII before, during, and after the Data Breach.

277.    Because of the Data Breach, Mr. Rosenboim's confidential PII is in the hands of cybercriminals. As such, Mr. Rosenboim and other Class Members are at imminent risk of identity theft and fraud.

278.    As a result of the Data Breach, Mr. Rosenboim must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

279.    Mr. Rosenboim places significant value on the security of his PII and does not readily disclose it. Mr. Rosenboim has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

280.    Mr. Rosenboim has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Following the Data Breach, Mr. Rosenboim received notice that his sensitive personal information has been found on the dark web. Additionally, Mr. Rosenboim has experienced a sharp increase in targeted phishing emails that incorporate information he provided to MKS.

281.    Mr. Rosenboim has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and MKS, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Rosenboim's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

282.    Mr. Rosenboim suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data

Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and MKS's possession and is subject to further unauthorized disclosures so long as Oracle and MKS fail to undertake appropriate and adequate measures to protect his PII.

283.    The Data Breach has caused Mr. Rosenboim to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and MKS have still not informed him of key details about the Data Breach.

### J.    Plaintiff Sampson

284.    Mr. Sampson is a former employee of Integra who was required to provide his PII, and that of his immediate family, as a condition of his employment with Integra.

285.    Upon information and belief, Mr. Sampson's PII was stolen from Oracle's and Integra's systems, networks, and/or software in the Data Breach.

286.    Oracle and Integra possessed Mr. Sampson's PII before, during, and after the Data Breach.

287.    Because of the Data Breach, Mr. Sampson's confidential PII is in the hands of cybercriminals. As such, Mr. Sampson and other Class Members are at imminent risk of identity theft and fraud.

288.    As a result of the Data Breach, Mr. Sampson must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

289.    Mr. Sampson places significant value on the security of his PII and does not readily disclose it. Mr. Sampson has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

290.    Mr. Sampson has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Following the Data Breach, one of Mr. Sampson's credit accounts experienced fraudulent charges Mr. Sampson did not make. Additionally, Mr. Sampson has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Integra.

291.    Mr. Sampson has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Integra, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Sampson's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

292.    Mr. Sampson suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Integra's possession and is subject to further unauthorized disclosures so long as Oracle and Integra fail to undertake appropriate and adequate measures to protect his PII.

293. The Data Breach has caused Mr. Sampson to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Integra have still not informed him of key details about the Data Breach.

**K.    Plaintiff Sanchez**

294. Mr. Sanchez is a former employee of Schneider who was required to provide his PII, and that of his immediate family, as a condition of his employment with Schneider.

295. Upon information and belief, Mr. Sanchez's PII was stolen from Oracle's and Schneider's systems, networks, and/or software in the Data Breach.

296. Oracle and Schneider possessed Mr. Sanchez's PII before, during, and after the Data Breach.

297. Because of the Data Breach, Mr. Sanchez's confidential PII is in the hands of cybercriminals. As such, Mr. Sanchez and other Class Members are at imminent risk of identity theft and fraud.

298. As a result of the Data Breach, Mr. Sanchez must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

299. Mr. Sanchez places significant value on the security of his PII and does not readily disclose it. Mr. Sanchez has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

300. Mr. Sanchez has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real

and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Following the Data Breach, Mr. Sanchez received notice that his sensitive personal information has been found on the dark web. Additionally, Mr. Sanchez has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Schneider.

301.    Mr. Sanchez has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Schneider, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Sanchez's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

302.    Mr. Sanchez suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Schneider's possession and is subject to further unauthorized disclosures so long as Oracle and Schneider fail to undertake appropriate and adequate measures to protect his PII.

303.    The Data Breach has caused Mr. Sanchez to suffer fear, anxiety, and stress, which has been compounded by the fact that Oracle and Schneider have still not informed him of key details about the Data Breach.

### L.    Plaintiff Wand

304.    Mr. Wand is a former employee of Logitech who was required to provide his PII, and that of his immediate family, as a condition of his employment with Logitech.

305.    Upon information and belief, Mr. Wand's PII was stolen from Oracle's and Logitech's systems, networks, and/or software in the Data Breach.

306.    Oracle and Logitech possessed Mr. Wand's PII before, during, and after the Data Breach.

307.    Because of the Data Breach, Mr. Wand's confidential PII is in the hands of cybercriminals. As such, Mr. Wand and other Class Members are at imminent risk of identity theft and fraud.

308.    As a result of the Data Breach, Mr. Wand must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

309.    Mr. Wand places significant value on the security of his PII and does not readily disclose it. Mr. Wand has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

310.    Mr. Wand has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach. Additionally, Mr. Wand has experienced a sharp increase in targeted phishing emails that incorporate information he provided to Logitech.

311.    Mr. Wand has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Oracle and Logitech, is protected and

safeguarded from future data breaches. Absent court intervention, Mr. Wand's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

312.    Mr. Wand suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Oracle's and Logitech's possession and is subject to further unauthorized disclosures so long as Oracle and Logitech fail to undertake appropriate and adequate measures to protect his PII.

313.    Oracle and Logitech have still not informed Mr. Wand of key details about the Data Breach.

### XVIII. CLASS ACTION ALLEGATIONS

314.    Plaintiffs bring this action on their own behalf and on behalf of the following "Nationwide Class":

> **Nationwide Class.** All individuals residing in the United States whose PII was compromised in the Data Breach.

315.    Plaintiffs' proposed class definition against Defendants includes proposed state class definitions against Defendants.

316.    Excluded from the Class are Defendants' officers, directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

317.    Plaintiffs reserve the right to amend or modify the definition of the Class or create additional Class or subclasses as this case progresses.

318.    **Numerosity**. The members of the Class are so numerous that joinder of all Class Members is impracticable. Public reporting presently indicates that there are dozens of impacted companies, with millions of customers and employees, whose data was implicated in the Data Breach.

319.    **Commonality**. There are questions of fact and law common to the Class, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

> a.    Whether Defendants had a duty to protect the PII of Plaintiffs and Class Members and whether they breached that duty.
>
> b.    Whether Defendants knew or should have known that their data security practices were deficient.
>
> c.    Whether Defendants' data security systems were consistent with industry standards before the Data Breach.
>
> d.    Whether Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, and/or injunctive relief.

320.    **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Members,' was compromised in the Data Breach.

321.    **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' Counsel are competent and experienced in litigating class actions, including data-breach class actions specifically.

322.    **Predominance**. Defendants engaged in a common course of conduct toward Plaintiffs and Class Members, whose data was stored on the same Oracle cloud based software and products and was unlawfully accessed in the same manner. The common issues arising from

Defendants' conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

323.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Class. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find the cost of litigating their individual claims to be prohibitively high and therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications as to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects each Class Member's rights.

324.    Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by individual member of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

- Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

325.     Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and contact information of all Class Members affected by the Data Breach.

## XIX.   CAUSES OF ACTION

### A.  Count I: Negligence

### (On behalf of the Plaintiffs and Class Members against all Defendants)

326.     Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

327.     Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, and safeguarding their PII in its possession from being compromised, stolen, or misused by unauthorized persons.

328.     Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendants would safeguard their PII.

329.     Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if their PII were wrongfully disclosed.

330.     By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Plaintiffs and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft.

331.     Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiffs and Class Members; (b) maintaining, testing, and monitoring Defendants' security systems to ensure that PII was

adequately secured and protected; (c) implementing intrusion detection systems and timely notifying customers of suspicious intrusions; (d) ensuring any third-party software products to which they entrusted Plaintiffs' and Class Members' PII were adequately and reasonably secure and not vulnerable to exploitation; and (e) adequately notifying Plaintiffs and Class Members about the types of data that were compromised in the Data Breach.

332.    Defendants' duties to use reasonable care arose from several sources, including those set out below.

333.    Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

334.    Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Defendants stored valuable PII that is routinely targeted by cybercriminals. Plaintiffs and Class Members were the foreseeable and probable victims of any breach resulting from Defendants' inadequate data security practices.

335.    Defendants further assumed a duty of reasonable care in making representations in marketing materials and their respective Privacy Policies, Notices and Statements concerning data security.

336.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

337.    Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiffs and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice

was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

338.    Defendants breached their duty owed to Plaintiffs and Class Members by failing to maintain adequate data security practices that conformed with industry standards and were therefore negligent. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII;

    b.    Failing to adequately monitor the security of their networks and systems;

    c.    Failure to adequately train their employees to maintain reasonable data security safeguards;

    d.    Allowing unauthorized access to Plaintiffs' and Class Members' PII;

    e.    Failing to detect in a timely manner that Plaintiffs' and Class Members' PII had been compromised;

    f.    Failing to remove Plaintiffs' and Class Members' PII they were no longer required to retain pursuant to regulations;

    g.    Failing to timely and adequately notify Plaintiffs and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

    h.    Failing to ensure any third party vendor or software they used were adequately and reasonably secure to protect the PII Plaintiffs and Class Members entrusted to Defendants.

339.    But for Defendants' negligence, the PII of Plaintiffs and Class Members would not have been stolen by cybercriminals in the Data Breach.

340.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they

obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

341.    Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

342.    The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against.

343.    Defendants' violation of Section 5 of the FTC Act constitutes negligence.

344.    The FTC has pursued enforcement actions against businesses, which, because they failed to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

345.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly considering Defendants' inadequate security practices.

346.    Plaintiffs and Class Members were the foreseeable and probable victims of any consequences of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and Class Members, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on their systems.

347.    It was therefore foreseeable that failing to adequately safeguard Plaintiffs' and Class Members' PII would result in one or more types of injuries to Class Members.

348.    There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiffs' and Class Members' PII and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The PII of Plaintiffs and Class Members was lost

and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

349.    As a direct and proximate result of Defendants' breach of their duties, Plaintiffs and Class Members have suffered injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) actual misuse of the compromised data consisting of fraudulent charges, the appearance of their sensitive information on the dark web, and an increase in spam calls, texts, and/or emails; (vi) nominal damages; and (vii) the continued and certainly increased risk to their PII, which: remains (a) unencrypted and available for unauthorized third parties to access and abuse; and (b) backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII.

350.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

351.    Plaintiffs and Class Members had no ability to protect their PII that was in, and remains in, Defendants' possession.

352.    Defendants were in a position to protect against the harm suffered by Plaintiffs and Class Members because of the Data Breach.

353.    Defendants' duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the

actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized a specific duty to reasonably safeguard PII.

354.    Defendants have admitted that the PII of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

355.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### B.    Count II: Breach of Implied Contract

**(On behalf of Plaintiffs and the Class against Defendants Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech)**

356.    Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

357.    As a condition of their employment and/or using or purchasing Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's products and services, Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech required Plaintiffs and Class Members to provide them with their PII.

358.    In mandating that Plaintiffs and Class Members provide their PII, Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech implied an assent to safeguard and protect their PII. In so doing, Plaintiffs and Class Members entered into implied contracts with Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech by which they agreed to safeguard and protect their PII, to keep it secure

and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

359.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's data security practices complied with relevant laws and regulations and were consistent with industry standards.

360.    Implicit in the agreement between Plaintiffs and Class Members, on the one hand, and Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech, on the other, was that in providing PII, Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech were obligated to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard that PII; (c) prevent unauthorized disclosures of the PII; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses; and (f) retain the PII only under conditions that kept it secure and confidential.

361.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech, on the other, is demonstrated by their conduct and course of dealing.

362.    Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech solicited, offered, and invited Plaintiffs and Class Members to provide their PII as part of Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's regular business practices. Plaintiffs and Class Members

accepted Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's offers and provided their PII to them.

363.    In accepting the PII of Plaintiffs and Class Members, Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech understood and agreed that they were required to reasonably safeguard the PII from unauthorized access or disclosure.

364.    Plaintiffs and Class Members would not have provided their PII to Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech had they known that they would not safeguard their PII as promised.

365.    Plaintiffs and Class Members fully performed their obligations under their implied contracts with Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech.

366.    Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech breached their implied contracts with Plaintiffs and Class Members by failing to safeguard their PII.

367.    At all relevant times, Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech promulgated, adopted, and implemented written privacy policies, notices, and statements whereby they expressly promised Plaintiffs and Class Members that they would disclose PII only under certain circumstances, none of which relate to the Data Breach.

368.    Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech further promised to comply with industry standards and federal regulations to make sure that Plaintiffs' and Class Members' PII would remain protected.

369.    As a direct and proximate result of Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's breaches of implied contract, Plaintiffs and Class Members have suffered injuries in fact including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) actual misuse of the compromised data consisting of fraudulent charges, the appearance of their sensitive information on the dark web, and an increase in spam calls, texts, and/or emails; (vi) nominal damages; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's possession and is subject to further unauthorized disclosures so long as they fail to undertake appropriate and adequate measures to protect their PII.

370.    As a direct and proximate result of Rheem's, Trimble's, Integra's, Milgard's, Envoy Air's, Emerson's, Michelin's, MKS's, Schneider's, and Logitech's breaches of implied contract, Plaintiffs and Class Members are entitled to damages, including compensatory damages, punitive damages, and/or nominal damages, in an amount to be proven at trial.

## C.    Count III: Unjust Enrichment

### (On behalf of Plaintiffs and Class Members against all Defendants)

371.    Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

372.    Plaintiffs bring this Count in the alternative to Count II above with respect to Rheem, Trimble, Integra, Milgard, Envoy Air, Emerson, Michelin, MKS, Schneider, and Logitech.

373.    Upon information and belief, Defendants fund any data security measures they implement entirely from their general revenues, including from money they make (including that supplied by contractual payments directly or indirectly by Plaintiffs and Class Members) based upon representations of protecting PII.

374.    Thus, there is a direct nexus between money paid to Defendants and the requirement that Defendants keep PII confidential and protected.

375.    Plaintiffs and Class Members paid Defendants, directly or indirectly, a certain sum of money, which was used to fund any data security measures implemented by Defendants.

376.    As such, a portion of the payments made by Plaintiffs and Class Members (or made on their behalf) is to be allocated to and used to provide a reasonable and adequate level of data security, the amount of which is known to Defendants.

377.    Protecting PII is integral to Defendants' businesses. Without PII, Defendants would be unable to provide the business services that comprise Defendants' core businesses.

378.    Plaintiffs' and Class Members' PII has monetary value. Thus, Plaintiffs and Class Members conferred a monetary benefit on Defendants.

379.    Defendants collected and stored the PII provided by Plaintiffs and Class Members to Defendants. In exchange, Plaintiffs and Class Members should have received from Defendants the services that comprise Defendants' businesses and should have had their PII protected with adequate data security.

380.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from the PII and used the PII for business purposes.

381. Defendants failed to secure the PII and, therefore, did not fully compensate Plaintiffs and Class Members for the value that the PII provided.

382. Had Plaintiffs and Class Members known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendants, sought employment from Defendants, or obtained services from Defendants.

383. Plaintiffs and Class Members have no adequate remedy at law.

384. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profit at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decisions to prioritize their own profits over the requisite data security and the safety of Plaintiffs' and Class Members' PII.

385. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

386. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) actual misuse of the compromised data consisting of fraudulent charges, the appearance of their sensitive information on the dark web, and an increase in spam calls, texts, and/or emails; (vi) nominal

damages; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII.

387.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

388.    Because Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, they plead this claim for unjust enrichment in addition to or in the alternative to other claims pleaded herein.

**D.**    **Count IV: Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.-Unfair Business Practices**

**(On behalf of Plaintiff Ferrero and Class Members residing in California against Oracle and  Trimble)**

389.    Plaintiff Ferrero repeats and re-alleges the factual allegations above as if fully set forth herein.

390.    California Plaintiff Ferrero brings this Count on her own behalf and on behalf of all Class Members residing in California.

391.    Defendants violated Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices, that constitute acts of "unfair competition" as defined in Cal. Bus. & Prof. Code § 17200. Oracle and Trimble's unfair methods of competition and unfair or deceptive acts, included the following:

a. Representing that their goods and services have characteristics, uses, benefits, and qualities that they do not have;

b. Representing that their goods and services are of a particular standard or quality if they are another; and

c. Advertising their goods and services with intent not to sell them as advertised.

d. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' residing in California PII, which was a direct and proximate cause of the Data Breach;

e. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

f. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' residing in California PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

g. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Class Members' residing in California PII, including by implementing and maintaining reasonable security measures;

h. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' residing in California PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

i. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and Class Members' residing in California PII; and

j. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' residing in California PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

392. Had Oracle and Trimble disclosed to Plaintiffs and Class Members residing in California that their data systems were not secure and thus were vulnerable to attack, Oracle and Trimble could not have continued in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Oracle and Trimble received, maintained, and compiled Plaintiff Ferrero's and Class Members' residing in California PII as part of the services Oracle and Trimble provided and for which Class Members residing in California paid

without advising Class Members residing in California that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff Ferrero's and Class Members residing in California PII. Accordingly, Plaintiff Ferrero and the Class Members residing in California acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

393.    Oracle and Trimble acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law and recklessly disregarded Plaintiff Ferrero's and Class Members' residing in California rights. Defendants: (i) represented in their information privacy and confidentiality policies, statements and notices that they were implementing reasonable security measures to protect Plaintiff Ferrero's and Class Members' residing in California sensitive personal information; and (ii) failed to implement reasonable data security measures. Oracle and Trimble's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities that solicitor are entrusted with personal data utilize appropriate security measures, as reflected by laws like the FTC Act, 15 U.S.C. § 45.

394.    As a direct and proximate result of Oracle and Trimble's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff Ferrero's and Class Members' residing in California reliance on them, Plaintiff Ferrero and Class Members residing in California have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants, since they would not have paid Defendants for goods and services or would have paid less for such goods and services but for Defendants' violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses

related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

395.    As a direct and proximate result of Oracle and Trimble's unlawful and unfair practices and acts, Plaintiff Ferrero and Oracle and Class Members residing in California were injured and lost money or property, including but not limited to the loss of Plaintiff Ferrero's and Oracle and Class Members' residing in California legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described herein.

396.    Oracle and Trimble knew or should have known that their computer systems and data security practices were inadequate to safeguard Plaintiff Ferrero's and Class Members' PII and that the risk of a data breach or theft was highly likely. Oracle and Trimble's actions in engaging in the above-named unlawful practices and acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff Ferrero and Class Members.

397.    Plaintiffs and Class Members have no adequate remedy at law.

398.    Plaintiff Ferrero, on behalf of Class Members residing in California, seeks relief under Cal. Bus. & Prof. Code § 17200, et seq., including but not limited to restitution to Plaintiff Ferrero and Class Members residing in California of money or property Oracle and Trimble may have acquired by means of their unlawful, and unfair business practices, restitutionary disgorgement of all monies that accrued to Oracle and Trimble because of Oracle and Trimble unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**E.    Count V: Violations of the California Customer Records law, Cal. Civ. Code §§ 1798.80-1798.84, et seq.**

**(On behalf of Plaintiff Ferrero and Class Members residing in California against Oracle and Trimble)**

399.    Plaintiff Ferrero repeats and re-alleges the factual allegations above as if fully set forth herein.

400.    California Plaintiff Ferrero brings this Count on her own behalf and on behalf of Class Members residing in California.

401.    "[T]o ensure that Personal Information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "own, license, or maintain Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

402.    Defendants are businesses that own or license computerized data that includes Personal Information, as defined by Cal. Civ. Code § 1798.82.

403.    Plaintiff Ferrero's and Class Members' residing in California PII includes Personal Information as covered by Cal. Civ. Code § 1798.82.

404.    Cal. Civ. Code § 1798.82, requires Defendants, in the most expedient time possible, to accurately notify individuals of a breach of their data security system without unreasonable delay.

405.    Defendants were aware of a breach of their security system, and were obligated to disclose the Data Breach in a timely and accurate fashion, as mandated by Cal. Civ. Code § 1798.82.

406.    To date, Defendants have failed to provide Plaintiff Ferrero or Class Members any notice of the Data Breach.

407.    By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated Cal. Civ. Code § 1798.82.

408.    As a direct and proximate result of Defendants' violations of Cal. Civ. Code § 1798.82, Plaintiff Ferrero and Class Members residing in California suffered damages, as described above.

409.    Plaintiff Ferrero and Class Members residing in California seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

**F.    Count VI: Violations of the Colorado Security Breach Notification Act, Colo. Rev. Stat. §§ 6-1-716, et seq.**

**(On behalf of Plaintiff Martel and Class Members residing in Colorado against Oracle and Milgard)**

410.    Plaintiff Martel repeats and re-alleges the factual allegations above as if fully set forth herein.

411.    Colorado Plaintiff Martel brings this Count on her own behalf and on behalf of Class Members residing in Colorado.

412.    Defendants are businesses that own or license computerized data that includes Personal Information, as defined by Colo. Rev. Stat. §§ 6-1-716(1) and 6-1-716(2).

413.    Plaintiff Martel's and Class Members' residing in Colorado PII includes Personal Information as covered by Colo. Rev. Stat. §§ 6-1-716(1) and 6-1-716(2).

414.    Colo. Rev. Stat. § 6-1-716(2), requires Defendants, in the most expedient time possible, to accurately notify individuals of a breach of their data security system without unreasonable delay.

415.     Defendants were aware of a breach of their security system, and were obligated to disclose the Data Breach in a timely and accurate fashion, as mandated by Colo. Rev. Stat. § 6-1-716(2).

416.     To date, Defendants have failed to provide Plaintiff Martel or Class Members any notice of the Data Breach.

417.     By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated Colo. Rev. Stat. § 6-1-716(2).

418.     As a direct and proximate result of Defendants' violations of Colo. Rev. Stat. § 6-1- 716(2), Plaintiff Martel and Class Members residing in Colorado suffered damages, as described above.

419.     Plaintiff Martel and Class Members residing in Colorado seek relief under Colo. Rev. Stat. § 6-1- 716(4), including actual damages and equitable relief.

**G.     Count VII: Violations of the Washington Data Breach Notification Act, Wash. Rev. Code §§ 19.255.010, et seq.**

**(On behalf of Plaintiff Rosenboim and Class Members residing in Washington against Oracle and MKS)**

420.     Plaintiff Rosenboim repeats and re-alleges the factual allegations above as if fully set forth herein.

421.     Washington Plaintiff Rosenboim brings this Count on his own behalf and on behalf of Class Members residing in Washington.

422.     Defendants are businesses that own or license computerized data that includes Personal Information, as defined by Wash. Rev. Code § 19.255.010(1).

423.     Plaintiff Rosenboim's  and Class Members' residing in Washington PII includes Personal Information as covered by Wash. Rev. Code § 19.255.010(5).

424.    Wash. Rev. Code § 19.255.010(1), requires Defendants, in the most expedient time possible, to accurately notify individuals of a breach of their data security system without unreasonable delay.

425.    Defendants were aware of a breach of their security system, and were obligated to disclose the Data Breach in a timely and accurate fashion, as mandated by Wash. Rev. Code § 19.255.010(1).

426.    To date, Defendants have failed to provide Plaintiff Rosenboim or Class Members any notice of the Data Breach.

427.    By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated Wash. Rev. Code § 19.255.010(1).

428.    As a direct and proximate result of Defendants' violations of Wash. Rev. Code § 19.255.010(1), Plaintiff Rosenboim and Class Members residing in Washington suffered damages, as described above.

429.    Plaintiff Rosenboim and Class Members residing in Washington seek relief under Wash. Rev. Code §§ 19.255.010(13)(a) and 19.255.010(13)(b), including actual damages and injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and that the Court grant the following:

A.    An Order certifying the Class and appointing Plaintiffs and their Counsel to represent the Class;

B.    Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.    Injunctive relief, including but not limited to injunctive and other equitable relief

as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an Order:

    i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii.    requiring Defendants to protect, including through encryption, all data collected through the course of their businesses in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

  iii.    requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and Class Members unless Defendants can provide the Court with reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

  iv.    requiring Defendants to pay out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of Plaintiffs' and Class Members' PII for their lifetimes;

   v.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' PII;

  vi.    requiring Defendants to engage independent third-party security auditors and/or penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

 vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

  ix.    requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendants' networks is compromised, hackers cannot gain access to other portions of Defendants' systems;

   x.    requiring Defendants to conduct regular database scanning and securing checks;

  xi.    requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees'

respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class Members;

xii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and how to respond to a breach;

xiii. requiring Defendants to implement testing systems to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, and randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting PII;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat-management program designed to appropriately monitor Defendants' information networks for internal and external threats and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face because of the loss of their confidential PII to unauthorized third parties as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Date:  December 2, 2025

Respectfully submitted,

By: /s/ *David C. Lawrence*

David C. Lawrence
Texas Bar No. 24041304
Braden N. Anderson
Texas Bar No. 24138083
**RIGBY SLACK, PLLC**
3500 Jefferson Street, Suite 330
Austin, Texas 78731
(512) 782-2060
dlawrence@rigbyslack.com
banderson@rigbyslack.com

James J. Pizzirusso (*Pro Hac Vice* forthcoming)
**HAUSFELD LLP**
1200 17th Street, NW, Suite 600
Washington, DC 20036
T: 202-540-7200
E: jpizirusso@hausfeld.com

***Counsel for Plaintiffs***